[No. S004704. Crim. No. 25109. May 15, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY THEODORE SHELDON, Defendant and Appellant.

942

COUNSEL

Frank O. Bell, Jr., and Harvey Zall, State Public Defenders, under appointment by the Supreme Court, Therene Powell and Nancy Gaynor, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Frederick R. Millar, Jr., Jay M. Bloom and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—Defendant Jeffrey T. Sheldon appeals from a judgment imposing the death penalty following his conviction of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), accompanied by three felony-murder special-circumstance findings (§ 190.2, subd. (a)(17)(i) (robbery-murder), (ii) (kidnap-murder), and (vii) (burglary-murder)). Additionally, with respect to the murder victim, defendant was convicted of robbery (§ 211), vehicle theft (Veh. Code, § 10851), kidnapping for ransom and extortion (§ 209, subd. (a)), and residential burglary (§ 459). Defendant was also convicted of crimes against three other victims, including kidnapping for ransom and extortion, robbery, burglary and assault with a firearm, each count accompanied by a firearm-use finding (§ 12022.5).

The jury returned special findings that the murder was deliberate and premeditated, that defendant intentionally killed the murder victim, and that he intentionally aided and abetted the murder with the specific intent to kill. The jury returned a verdict of death, and the trial court denied defendant's motion to modify the sentence. As will appear, we conclude that, with the exception of the weapon-assault charge, no prejudicial error was committed, but that the judgment of death should be vacated and the

case remanded to the trial court for further proceedings on defendant's automatic application for modification of sentence (§ 190.4, subd. (e)) because of the court's failure to state the reasons supporting the denial of that application.

## I. GUILT PHASE FACTS

The present offenses occurred within a three-day period in September 1983. On September 11, defendant robbed the employees (Armstrong and Davis) and owner (Malone) of the Pizza Bowl Restaurant in Lake Elsinore, confronting these men with a shotgun, and threatening to "blow your brains out." Defendant kidnapped and drove off with Malone, but later released him unharmed.

The next day, September 12, defendant asked his wife, Denise, if she knew any wealthy persons, and she named 60-year-old Norris Neblett. The couple drove to Neblett's residence and confronted him at gunpoint. According to Denise (who was granted a reduced, eight-year sentence in return for her testimony), defendant gave her a wad of money he had collected from Neblett, and thereupon drove off with the victim to a motel, where the three spent the night.

The next day, September 13, defendant and Neblett went to Neblett's bank, where Neblett cashed a check for $10,000 and gave the proceeds to defendant. Later in the day, Jack McFadden, a confederate of defendant, cashed a $2,500 check drawn on Neblett's account, and that same day tendered an $8,500 check on that account. The latter check was returned uncashed after an unsuccessful attempt to contact Neblett by phone. Soon thereafter, firemen were notified of a vehicle fire involving Neblett's 1980 BMW automobile. Investigation of Neblett's residence uncovered his body. The cause of death was strangulation; his body and face were heavily bruised. His body was found on the floor; evidently he had been smothered with a pillow weighted down by a couch and chair. His face, neck, eyebrow, lip and chin showed abrasions, his nose was smashed almost flat against his face, and his body apparently had been kicked or beaten.

On September 14, defendant and Denise flew to Michigan, taking Neblett's camera and stamp collection along with them. They disposed of the shotgun and engaged in a spending spree before being apprehended.

## II. GUILT PHASE AND SPECIAL CIRCUMSTANCES ISSUES

### A. *Failure to Provide Jury with Written Instructions*

Defendant first contends that the trial court erred in denying his motion to have written copies of the jury instructions given to the jurors for

use during their deliberations at the guilt and penalty phases. Instead, the court advised the jurors that although they would not have the written instructions, "should you at any time wish to have any portion or all of the instructions read again, all you have to do is so indicate and we will do it." The jury did not request a rereading of any guilt phase instruction, although it did ask the court to repeat its penalty instructions.

Defendant concedes that at the time of trial the applicable statutes and case law gave the court discretion to provide the jury with written instructions. (See former §§ 1093, subd. (6), 1137; *People* v. *Anderson* (1966) 64 Cal.2d 633, 640 [51 Cal.Rptr. 238, 414 P.2d 366] [upholding denial of written instructions, despite request by jury foreman, because compliance would unduly delay trial].) In 1986, section 1093, subdivision (6), was amended to provide for written jury instructions upon request *by the jury*. The section continues to provide for an exercise of discretion in the absence of such a request.

Defendant observes, however, that in the present case, unlike *Anderson, supra,* 64 Cal.2d 633, the trial court stated no reason for denying defendant's motion. Moreover, the instructions comprise more than 60 pages of reporter's transcript, magnifying the likelihood of jury confusion regarding the various charges. According to defendant, the trial court both abused its discretion and denied defendant his constitutional rights by failing to provide written instructions.

In essence, defendant's premise is that jurors generally are unable fully to comprehend orally delivered instructions. As he states the argument, "a jury which is forced to rely on the court's oral presentation cannot be expected to remember, understand, and apply the instructions in a rational manner consistent with the applicable law." He cites law review articles which refer to various studies confirming the difficulty jurors have in comprehending legal issues based on oral instructions, and urging the availability of written instructions in the jury room. (See also *United States* v. *Miller* (9th Cir. 1976) 546 F.2d 320, 324, fn. 3.)

It does not appear that any of the studies or articles cited by defendant took into consideration the alternative of a *rereading* of instructions, such as was available here. Indeed, the jurors asked for a rereading of the penalty instructions, and the record contains no further indication of uncertainty or confusion on the jury's part regarding the instructions. Although numerous criminal acts were charged, no complex legal issues were involved. Indeed, the jury's guilt phase deliberations were completed in two days. The penalty phase jury announced a possible "deadlock" after deliberating for two days,

but reached a verdict after two more days of deliberations. There is no indication that instructional confusion contributed to the deadlock.

We conclude that the trial court did not err, or abuse its discretion, in denying defendant's motion for written jury instructions.

### B. *Shackling Defendant*

After the commencement of trial, a hearing was held to determine the necessity of shackling defendant with leg irons. A handcuff key had been found in the possession of defendant's confederate, McFadden. Hearsay evidence from a confidential informant, admitted without objection, indicated defendant might also have access to such a key; in addition, he had committed five assaults on other inmates, and was facing a life prison term in Nevada. The testifying officer deemed defendant a "high escape risk." The court ordered defendant shackled, after finding that the restraints probably could not be seen from the jury box.

Later, during voir dire, one of the jury panel members indicated to the court that she had viewed defendant's restraints. (Evidently, the panel was so large in number that some members were seated in the spectator section of the courtroom, where they were able to see the shackles.) Thereupon, the court stated to the assembled panel that apparently some of its members may have noted that defendant was "in custody," and admonished the panel that such "custody" had no relevance to the issue of his guilt, and should not in any way affect the verdict. Defense counsel, who had proposed a "general" admonishment of this kind, made no objection to the phrasing chosen by the court.

As defendant observes, because of its potentially prejudicial impact on the jury, shackling is to be employed only as a last resort, based on "a showing of manifest need for such restraints." (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1261 [232 Cal.Rptr. 849, 729 P.2d 115; *People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People* v. *Jacla* (1978) 77 Cal.App.3d 878, 883 [144 Cal.Rptr. 23].) According to defendant, there was no manifest need for shackling in this case. He contends that shackling cannot be justified solely on the basis of earlier prison disciplinary violations, and that the other evidence was insufficient to sustain the trial court's ruling. We disagree.

The court's shackling decision "cannot be successfully challenged on review except on a showing of a manifest abuse of discretion." (*Duran, supra,* 16 Cal.3d at p. 293, fn. 12; *Allen, supra,* 42 Cal.3d at p. 1263.) Here, the evidence summarized above was a sufficient basis for shack-

ling, for it indicated a substantial risk that defendant might attempt an escape. Moreover, the court made a good faith, although inaccurate, determination that defendant's shackles would not be viewed by the jury.

Defendant also challenges the adequacy of the court's subsequent admonition, which referred merely to the fact that defendant was "in custody." Yet the court's euphemistic description was perhaps a more appropriate tactic than placing additional emphasis on defendant's shackles by directly mentioning them. It appears that many of the panelists remained unaware of the shackles, and the few jurors who actually observed them apparently had only a brief look at them. (See *People* v. *Rich* (1988) 45 Cal.3d 1036, 1084-1085 [248 Cal.Rptr. 510, 755 P.2d 960] [brief viewing of defendant in shackles not prejudicial error]; *People* v. *Duran, supra,* 16 Cal.3d at p. 287, fn. 2 [same].) As previously noted, defense counsel neither objected to the admonition nor requested clarifying language.

We conclude that no abuse of discretion occurred here.

C. *CALJIC No. 2.11.5*

The court gave the standard instructions regarding the corroboration and evaluation of accomplice testimony (CALJIC Nos. 3.10, 3.11, 3.12, 3.13, 3.16 and 3.18). In addition, the court gave CALJIC No. 2.11.5, which admonished the jury not to discuss or consider (1) why persons, other than defendant, who may have been involved in the offenses nonetheless were not being prosecuted in this trial, or (2) whether they have been or will be so prosecuted.

■ Defendant correctly observes that CALJIC No. 2.11.5 should not be given where such other "persons" actually appear at trial and testify for the prosecution. In such a case, it is entirely proper for the jury to consider whether cooperating accomplices avoided prosecution in return for testifying against defendant. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221].)

■ In the present case, defendant's wife, Denise, testified against defendant in return for a reduced sentence. (As the People point out, the instruction could also have applied to accomplice McFadden, who refused to testify at defendant's trial.) Defendant fears that CALJIC No. 2.11.5 may have hampered the jury's evaluation of Denise's highly inculpatory testimony. He observes that, in view of the "clear cut" nature of the felony-murder

rule, he does not contend that the instructional error affected the guilt verdicts. He maintains, however, that the error was sufficiently serious to require reversal of the special circumstances findings and penalty judgment.

According to defendant, a properly instructed jury might well have found that Denise played a greater role in the murder than defendant. (Denise testified that everything she did was at defendant's direction.) Although defendant fails to indicate how the error could possibly have affected the special circumstances findings (which likewise seem "clear cut" once the felony-murder counts are sustained), he makes the following argument regarding the effect on penalty: "In sum, the error made it more likely that the jury would find appellant took a leading role and that he therefore was the actual perpetrator of the murder or at least an intentional aider of it. The error also made it more likely that the jury's sense of proportionality and fairness would not be offended by sentencing appellant to death in the face of Denise's eight-year sentence."

■ As we recently stated in a case involving a similar challenge to the giving of CALJIC No. 2.11.5, "In determining whether an instruction interferes with the jury's consideration of evidence presented at trial, we must determine 'what a reasonable juror could have understood the charge as meaning.' [Citation.] While the initial focus is on the specific instruction challenged [citation], we must also review the instructions as a whole to see if the entire charge delivered a correct interpretation of law. [Citation.]" (*People* v. *Garrison* (1989) 47 Cal.3d 746, 780 [254 Cal.Rptr. 257, 765 P.2d 419]; see *People* v. *Williams, supra,* 45 Cal.3d 1268, 1312-1313.)

We held in *Garrison, supra,* 47 Cal.3d 746, that any error in giving CALJIC No. 2.11.5 was cured by other instructions, and that the same result would have obtained in the absence of this error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) ■ We reach a similar conclusion here.

In the present case, apart from Denise's testimony, there was substantial evidence, both direct and circumstantial, of defendant's guilt. There was very little evidence supporting the speculative theory that Denise may have taken a major role in the murder and other offenses. Moreover, defendant had full opportunity to cross-examine Denise, and to explore and argue to the jury any possible bias or collateral motive on her part.

Finally, as previously noted, the jury was given the full set of instructions for evaluating accomplice testimony, including the admonition that accomplice testimony should be viewed with distrust. Accordingly, although error occurred in giving CALJIC No. 2.11.5, nonetheless as in *Garrison, supra,* 47

Cal.3d 746, it is unlikely that the instruction prejudiced defendant in any way. Despite the "nonprosecution" instruction, the jury remained free to discredit Denise's testimony.

## III. Penalty Phase Facts

### A. *Aggravating Evidence*

The People introduced evidence of a 1983 Nevada offense in which defendant had confronted, assaulted, robbed and threatened to kill an elderly couple, Raymond and Kathryn Mahan, at their vacation home in Incline Village. The evidence also disclosed that defendant's rifle was discharged during a struggle with the arresting officer, and that defendant later bragged that "I tried to take one with me." Further discussion of this Nevada offense is set forth in part IV.A.1 of this opinion.

### B. *Mitigating Evidence*

Background and character evidence was given by defendant's mother, aunt and grandmother, and by a clinical psychologist, Dr. Rath. Defendant had a troubled childhood, and was regularly bullied and taunted by his stepfather and classmates, who made fun of his clumsiness, hyperactivity and dyslexia. Defendant was described as a poor student, but was hardworking and loving toward his family.

Two months before the murder, defendant found Denise in bed with another man, leading to a temporary breakup of their marriage. Dr. Rath believed that his relationship with Denise was a source of continual emotional turmoil for defendant. As result of his childhood disorders, defendant exhibited moodiness, chronic sadness, occasional aggression, excess anxiety, and a low tolerance of frustration. Dr. Rath confirmed that defendant had suffered some damage in the verbal areas of the left hemisphere of his brain, indicating he was dyslexic and probably a hyperactive child.

## IV. Penalty Phase Issues

### A. *Other-crimes Evidence*

1. *Prior Attempted Murder Charge*—As previously indicated, at the penalty phase the People introduced evidence of defendant's 1983 robbery of the Mahans. This evidence included testimony that his weapon discharged during a struggle with the arresting officer, and that the firing of the gun may have been intentional, and not merely accidental. In his closing

arguments, the prosecutor, without characterizing defendant's conduct as attempted murder, nonetheless emphasized his statement to his grandmother that "I tried to take one with me." In addition, the trial court, in instructing on the People's other-crimes evidence, and on the requirement that such crimes be proved beyond a reasonable doubt, listed attempted murder as one of these possible crimes.

■ Defendant points out that he was formally acquitted by a Nevada state court of a charge of attempted murder based on the shooting episode, and he argues that, accordingly, evidence, argument or instructions regarding that portion of the incident should have been excluded under the third paragraph of section 190.3. ("However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted.") Defendant contends that the error not only violated section 190.3, but also constituted a violation of federal due process and double jeopardy guaranties. Because the issue is close, we review it in some detail.

a. *The evidence*—The People introduced evidence showing that in 1983, a few weeks after the Neblett murder, defendant and a confederate, both armed, entered the Nevada vacation home of an elderly couple, the Mahans, forced Mrs. Mahan to accompany them from the garage through the house, pointed their guns at Mr. Mahan, and threatened to kill the couple unless they produced some money. Defendant, with his hand covering her nose and mouth, had dragged Mrs. Mahan into the den after she blacked out from lack of air. When she awoke, she heard defendant threaten her husband to "tell the truth or I'll shoot you. You move and I'll shoot your foot off." When Mr. Mahan attempted to approach his unconscious, moaning wife, defendant again threatened to kill him.

Defendant demanded $500,000 from the Mahans, but was told they had no such funds. The men eventually took $200 from the Mahans and looked through Mrs. Mahan's purse. Although the record fails to indicate whether defendant was ever convicted of any offense against the Mahans, both parties agree that the foregoing evidence was admissible as aggravating penalty phase evidence. (At oral argument before this court, the People represented that defendant indeed had been convicted of several offenses involving the Mahans, and was given a life sentence by a Nevada court.)

In addition, the People were permitted to introduce evidence that a Chris Smith, a sheriff's deputy, responded to the Mahans' alarm and confronted defendant, who shoved a rifle into Smith's stomach. As Smith swatted the gun away, it discharged once. Defendant dropped the rifle, fled and was

eventually caught and jailed. He called his grandmother from the jail and, among other things, told her that "I tried to take one with me."

Deputy Smith testified that in his opinion the gun did not fire accidentally. On cross-examination, Smith admitted that the gun had discharged almost immediately after he touched it, and he agreed that it was possible the gun fired accidentally when he struck it, although he insisted "that was not the case." Smith also confirmed that although defendant had been charged in Nevada with attempting to murder him, defendant was acquitted by the jury of that offense.

b. *The jury arguments*—In his closing argument, the prosecutor referred to the Mahan incident, but avoided mention of the discharge of the weapon during the struggle with Deputy Smith. Although the prosecutor reminded the jurors of defendant's statement to his grandmother, he made no reference to the attempted murder charge arising therefrom.

Defense counsel mentioned the firing of the weapon but stressed the necessity of finding, beyond a reasonable doubt, that any criminal activity arose therefrom. Counsel noted the absence of any certified documents indicating that defendant had been convicted of any crime in Nevada, and observed that "the only sure evidence you have" is that a Nevada jury found defendant "not guilty of shooting at that police officer . . . . [¶] It was an accidental shooting. It obviously had to be their finding."

c. *The instructions*—The trial court, instructing on the "other crimes" evidence, told the jurors that evidence has been introduced for the purpose of showing that defendant had committed "robbery, burglary, kidnaping, attempted murder and assault and battery," and cautioned them that before they could consider any such acts as an aggravating circumstance, they must be satisfied beyond a reasonable doubt that defendant did in fact commit them.

d. *Discussion*—The People appear to concede that the court erred in instructing on attempted murder. They also agree that evidence or argument relating *solely* to the attempted murder charge would have been inadmissible, but they observe that the evidence admitted here was equally relevant to establish defendant's criminal assault on the officer, whether or not it technically amounted to attempted murder. According to the People, section 190.3 should not bar evidence that the defendant committed lesser crimes other than the particular crime of which he was acquitted. Thus, whereas the acquittal of attempted murder charges may have been based on lack of proof of a specific intent to *kill,* the evidence admitted here was

entirely consistent with an intent to *shoot,* criminal conduct properly admissible under section 190.3, first paragraph.

We disagree with the People. The bar of section 190.3 as to acquittals could be readily circumvented if the People could simply admit evidence surrounding the acquitted offense which involved additional, lesser criminal misconduct. We have acknowledged that double jeopardy and due process principles would bar retrial of "final verdicts of guilt or innocence (including lesser included and greater inclusive offenses) . . . ." (*People* v. *Melton* (1988) 44 Cal.3d 713, 756, fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741].) As defendant observes, under Nevada law his acquittal of attempted murder would bar conviction or retrial of all necessarily included lesser offenses, including the assaultive offenses cited by the People. We conclude that the court erred under section 190.3 in instructing on an attempted murder charge of which defendant had been formally acquitted. We also conclude that evidence supporting the attempted murder charge was inadmissible under that section.

The People note that trial counsel failed to object to either the evidence or argument regarding the foregoing evidence, and accordingly, the issue was waived for appeal. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) Although defendant characterizes his trial counsel's omission as incompetence, we have seldom found a mere failure to object to evidence or argument as reflecting counsel's incompetence. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 291-292 [168 Cal.Rptr. 603, 618 P.2d 149].)

Moreover, as we explain, under the circumstances here, it does not appear that counsel's omission deprived defendant of a meritorious defense (see *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) or affected the outcome of the penalty trial (see *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]).

The error in instructing on attempted murder, and in admitting the challenged evidence, was not prejudicial error in this case. First, all of the remaining evidence concerning the armed assault and robbery of the Mahans was properly admitted as potential aggravating circumstances, including defendant's threats, while brandishing a rifle, to kill them both. That was the evidence the prosecutor emphasized in closing argument. Only that portion of the evidence pertaining to defendant's struggle, the discharge of his weapon, and defendant's subsequent remark to his grandmother, were inadmissible. As the record indicates, the prosecutor's argument was largely confined to the assault and robbery of the Mahans; he made no mention of

the firing of defendant's weapon, or the attempted murder charge arising therefrom.

Second, defense counsel was permitted to establish that defendant had been formally acquitted of the attempted murder charge. As previously indicated, during closing argument counsel emphasized that "a jury in the State of Nevada found Mr. Sheldon not guilty of shooting at that police officer, Sergeant Smith, not guilty. . . . It was an accidental shooting." Defense counsel stressed that before the jury could consider the offense as an aggravating penalty factor, the jury must be convinced beyond a reasonable doubt that the offense occurred. The jury was formally instructed to that effect.

Given the Nevada acquittal, the strong wording of the reasonable-doubt instructions, the rather ambiguous circumstances surrounding the shooting, including the substantial chance that the gun discharged accidentally, and the lack of emphasis placed on the incident by the prosecutor in closing argument, it is not reasonably or realistically possible that the jurors (1) found attempted murder was established beyond a reasonable doubt, and (2) deemed that offense an aggravating circumstance which actually affected their penalty verdict.

In other words, we conclude that no reasonable juror, after being told of the Nevada acquittal, would nonetheless find beyond a reasonable doubt, on this weak record, that defendant attempted to murder Deputy Smith, and that he should die because of that attempt.

2. *Prior Kidnapping Offense*—The trial court included simple kidnapping as one of the Nevada offenses which the jury might consider as an aggravating circumstance if proved beyond a reasonable doubt. Defendant now contends that the evidence of kidnapping was insufficient as a matter of law and accordingly the jury should not have been instructed regarding that offense. We agree, but find the error harmless.

The evidence at issue indicated that defendant confronted Mrs. Mahan in her garage, forcibly pulled her into the house (adjoining the garage), and dragged her through the hall, kitchen, dining room and finally into the den. Although the record does not reveal the distances involved, it does appear that the asportation took place almost entirely within the Mahan home. Defendant contends that, for this reason, and regardless of the actual distance involved, the asportation did not amount to kidnapping. (See *People* v. *Brown* (1974) 11 Cal.3d 784, 788-789 [114 Cal.Rptr. 426, 523 P.2d 226] [forcible asportation through house, and outdoors for distance of 75 feet, not kidnapping]; *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1140 [80

Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] [movement from one room to another insufficient to constitute kidnapping for robbery]; *People* v. *John* (1983) 149 Cal.App.3d 798, 804-810 [197 Cal.Rptr. 340] [465-foot asportation insufficient].)

█ The People note that there is no "bright line" test for kidnapping, and that the offense may occur as long as the distance involved is not "slight" or "trivial." (*People* v. *Stanworth* (1974) 11 Cal.3d 588, 601 [114 Cal.Rptr. 250, 522 P.2d 1058]; see *People* v. *Stender* (1975) 47 Cal.App.3d 413, 423 [121 Cal.Rptr. 334] [200-foot asportation from house to outdoor area underneath pier held sufficiently substantial].) Moreover, as the People observe, even if the offense here may not have involved kidnapping, it certainly did involve some form of criminal activity (e.g., false imprisonment, assault) properly admissible as an aggravating circumstance. (See § 190.3, factor (b).)

Finally, according to the People, defendant made no objection to the evidence at issue, and failed to request additional instructions apart from the general "other crimes" instruction which included kidnapping as one of defendant's possible offenses. Had defendant wished the jury to focus on the issue of distance, he could have asked for additional instructions which defined the elements of kidnapping. (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 68 [222 Cal.Rptr. 127, 711 P.2d 423].)

█ We agree with defendant that the asportation at issue was too minor to constitute kidnapping, and that the court erred in including that offense in the other-crimes instruction. █ But we agree with the People that the error was undoubtedly harmless. The evidence in question was admissible to show defendant's other criminal conduct, and no reasonable juror, using a commonsense or lay person's view of what constituted a kidnapping, would have deemed the in-house asportation a kidnapping beyond a reasonable doubt, or have considered that limited asportation a material aggravating circumstance in determining defendant's penalty. The jury's focus would have been directed to defendant's *conduct* in dragging Mrs. Mahan throughout the house, and threatening to kill her and her husband if they did not comply with his demands.

B. *Mandatory Sentencing Statute*

Defendant observes that the jury was instructed in the unadorned statutory language that "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death." █ He suggests that these instructions were inadequate to inform the jury that it should find the "appropriate" penalty for defendant

regardless of the number or weight of the applicable aggravating and mitigating factors. (See *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1035-1041 [254 Cal.Rptr. 586, 766 P.2d 1]; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1276-1277; *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [114 Cal.Rptr. 426, 523 P.2d 226].)

Defendant also observes that, in response to a juror's inquiry regarding the meaning of the term "mitigating," the trial court indicated that mitigation means "good things" about defendant, and that a life imprisonment without parole sentence should be imposed if the "good things" outweighed the bad. Defendant suggests that this simplistic response may have prejudiced him if the jury confined itself to merely "good" or positive aspects about him, rather than attempting to find an appropriate penalty based on a consideration of *all* factors which might militate in favor of a lesser penalty, including such negative factors as his troubled childhood and family history, his drug use and his marital problems.

Our review of the record indicates the jury was not misled concerning the scope of its sentencing responsibilities. First, the jury was given a modified section 190.3 factor (k) instruction which advised it to consider "any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, including sympathy." Thus, the instructions made it clear that the jury was to weigh and consider *all* mitigating evidence in the case (see *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813]).

In addition, the court gave a further modified instruction which explained that if the weight of the mitigating circumstances equals or exceeds the weight of the aggravating ones, the jury must return a verdict of life without parole, and that in determining whether or not mitigating circumstances outweigh aggravating ones, "you are not bound by the number of circumstances on each side. One circumstance in either mitigation or aggravation might outweigh all the contrary circumstances."

The prosecutor made certain comments indicating that a mere count of the various applicable sentencing factors would be determinative of penalty, but he later explained that mere count was insufficient. Thus, the prosecutor at one point urged the jury to "add up all the factors. Are the factors in favor of the defendant? Are the factors against the defendant? If the factors against the defendant outweigh the factors for the defendant, then your duty is to impose the death penalty." But later in his argument, the prosecutor reviewed the various sentencing factors, applied them to the evidence, and explained an important "caveat" set forth in the court's instructions: "[I]n determining whether or not circumstances in aggravation outweigh

those in mitigation . . . you are not bound by the number of circumstances on each side. One circumstance in either mitigation or aggravation might outweigh all the contrary circumstances."

The prosecutor stated that if the jury would "follow the law," it would reach the inevitable conclusion that defendant "justly deserves" the death penalty, and admonished the jury to "apply the law no matter which way it cuts." But nothing in the prosecutor's argument stressed the mandatory language of the sentencing statute.

Defense counsel explained to the jury that it was faced with only one issue, namely, whether defendant should live or die. Counsel observed that death is reserved for "the most despicable criminals" who are "virtually without any redeeming worth," and he emphasized aspects of defendant's character and background that mitigated his offense. Counsel listed several sentencing factors that he deemed mitigating, including the absence of any prior conviction, defendant's emotional stress arising from his troubled background and family life, his intoxication at or around the time of the offense, and his age (21) at that time. Counsel reiterated that in weighing the various factors, "[i]t is not a matter of numbers. It is not saying 'There are five here and three here,' it is how strong each one is. [¶] Either way, one can outweigh all of the rest. . . . [¶] In other words, it is what is in your heart."

As we stated in *People* v. *Hendricks* (1988) 44 Cal.3d 635, 655 [244 Cal.Rptr. 181, 749 P.2d 836], "[w]e see no impropriety in a prosecutor urging that the jurors 'follow the law' and base their penalty decision on a weighing of the applicable factors, so long as it is understood that *inherent in the weighing process itself* is the determination of 'appropriateness' . . . . As previously noted, the jury in the present case fully understood that it could assign whatever weight it deemed appropriate to the various aggra- vating and mitigating factors, and that its penalty decision should be based on *all* the evidence in the case."

As in *Hendricks,* we conclude that, by reason of the court's modifications of the standard sentencing instructions, and the jury arguments themselves, the jury in the instant case fully understood its sentencing responsibilities. The jury knew that it should consider all the mitigating evidence in the case, and knew that it could assign whatever weight it chose to the various applicable sentencing factors. It is inconceivable that a jury armed with such understanding would fail to appreciate its responsibility to find an "appropriate" penalty for defendant. The prosecutor urged the jury to return the verdict defendant "deserves," that is, the appropriate verdict under the circumstances. We find it significant that the jury, appreciating

the seriousness of its task, deliberated for several days before rendering its verdict of death.

In a related argument, defendant contends that because the jury was never told to determine whether death was an appropriate punishment, the California statutory scheme is unconstitutional as applied to defendant. As we have explained, we cannot accept defendant's initial premise that the jury was inadequately informed regarding its appropriateness determination.

### C. Multiple Counting of Robbery, Burglary and Kidnapping Special Circumstances

 Defendant contends it was error to charge and instruct the jury on the robbery special circumstance (§ 190.2, subd. (a)(17)(i)), the burglary special circumstance (id., (a)(17)(vii)), and the kidnapping special circumstance (id., (a)(17)(ii)), because all three arose out of the same indivisible course of conduct, having the principal criminal purpose of robbing victim Neblett. He relies on the plurality opinion in People v. Harris (1984) 36 Cal.3d 36, 60-67 [201 Cal.Rptr. 782, 679 P.2d 433]. We have since held, however, that multiple special circumstances can be charged and considered in aggravation of the penalty where, as here, each one invades a separate societal interest. (People v. Bean (1988) 46 Cal.3d 919, 954-955 [251 Cal.Rptr. 467, 760 P.2d 996]; People v. Melton, supra, 44 Cal.3d 713, 765-769.) Thus, it was proper to allow the jury to find and consider all three special circumstances.

### D. Double Counting of Circumstances of Charged Offense

As defendant notes, among other factors the jury is to consider in aggravation or mitigation under section 190.3 are "(a) [t]he circumstances of the crime for which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . ."; "(b) [t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"; and "(c) [t]he presence or absence of any prior felony conviction." Defendant urges that, literally construed, this language allows the jury to count the violent circumstances of the current crime as aggravating factors under *both* factors (a) and (b).

 We have held that the term "criminal activity [involving] force or violence" as used in section 190.3 factor (b) is limited to conduct other than the immediate circumstances for which the death penalty is being contemplated. (*Melton, supra,* 44 Cal.3d at p. 763; *People v. Miranda* (1987) 44

Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127].) But as those cases explain, in the absence of improper argument by the prosecutor, any ambiguity in the language of the statute or current instructions will rarely have caused prejudice. (*Ibid.*) Defendant cites no such improper argument here.

### E. *Failure to Delete Inapplicable Sentencing Factors*

■ Defendant complains that the trial court, in instructing the penalty jury regarding its sentencing task, failed to delete inapplicable sentencing factors from the list of factors enumerated in section 190.3. The point was rejected in *People v. Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250], and need not be reconsidered here. (See also *People v. Melton, supra,* 44 Cal.3d 713, 770-771; *People v. Miranda, supra,* 44 Cal.3d 57, 104.)

Defendant suggests that the instruction violated federal constitutional law, but the authorities cited do not support that thesis. Although juries properly may be instructed to ignore extraneous matters in deciding penalty (e.g., *California v. Brown* (1987) 479 U.S. 538, 543 [93 L.Ed.2d 934, 941, 107 S.Ct. 1250]), to our knowledge no federal case has proscribed an instruction which sets forth the full range of potentially aggravating or mitigating circumstances, and which allows the jury to consider those factors "if applicable" to the case.

### F. *Requirement of Extreme Mental Distress*

■ Defendant next asserts the court erred in instructing (in the statutory language) that the jury could consider whether defendant was influenced by "extreme mental or emotional disturbance" when the offense was committed. Defendant suggests that confining the evidence to an "extreme" condition improperly limited the scope of the mitigating evidence admissible at the penalty phase. The point was rejected in *People v. Ghent, supra,* 43 Cal.3d 739, 776, and need not be reconsidered here. (See also *People v. Brown* (1988) 46 Cal.3d 432, 457-458 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Defendant argues that *Ghent, supra,* 43 Cal.3d 739, is distinguishable. He observes that in the present case the prosecutor minimized the significance of the evidence of defendant's mental distress arising from his childhood experiences and the breakup of his marriage. The prosecutor questioned whether such distress would amount to an "extreme" disturbance, but he stopped short of asking the jury to ignore such evidence as legally irrelevant to the penalty issue. Moreover, the court expressly instructed the jury (through a modification of the standard statutory language) that it could

consider *any* aspect of defendant's character that he offered as a basis for a sentence less than death. We conclude that *Ghent* controls here.

### G. Unlocking the Deadlocked Jury

The jurors began their penalty deliberations on November 14, 1985, at 3:43 p.m. They picked a foreman and were excused for the day. They deliberated from 9:30 to 4:30 the following day, but could not reach a verdict. Deliberations resumed at 9:30 a.m. on November 18. At 2:25 p.m. of that day, the foreman sent the court a note which stated that "We, the jury, are at an 11 to 1 vote. The one vote is for life and will not change. The other 11 hold firm for the death penalty. We feel we will be unable to reach a verdict."

The court convened the jury. (Because the judge who presided over the trial was unavailable, another judge had been assigned to hear the jury's verdict.) The court asked the foreman if he believed the jury was hopelessly deadlocked. The foreman replied, "We've talked it over and yes . . . ." The court asked whether a rereading of the instructions or testimony might help, and the foreman replied that such measures had not been discussed, and that he was not sure they would improve the situation. According to the foreman, the deadlock was reached after only one ballot.

The court questioned some of the other jurors, and several of them confirmed the deadlock but expressed the hope that further instructions from the court might assist in bringing about a verdict. Although one juror believed that further deliberations would be futile, another juror disagreed and expressly requested a rereading of the instructions. The court announced its intention to reread the penalty instructions, then dismiss the jurors for the day, and bring them back the following day to resume deliberations. Defense counsel neither objected to this procedure nor offered alternative suggestions. The foreman, however, requested that the instructions be given in the morning "So that they're fresh in our mind." The court agreed, and dismissed the jury for the day.

The next morning, defense counsel moved for a mistrial on the ground that to force a resumption of deliberations after the jury had announced a deadlocked vote of 11 to 1 in favor of death would be the equivalent of directing a death verdict. The court denied the motion and, after recalling the jury, reread the penalty instructions.

Included in these instructions was the admonition that "It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so. Each of you must decide the case for yourself, but should

do so only after a discussion of the evidence and instructions with the other jurors. [¶] You should not hesitate to change an opinion if you are convinced it is erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

The jurors resumed their deliberations at 9:30 a.m. At noon, the jury was excused for the day because of the personal business of one of the jurors. They reconvened at 9 a.m. on November 20, and 45 minutes later returned their verdict of death. Defendant's unsuccessful motion for new trial argued that the court had coerced the jurors into returning their verdict. That contention is repeated here.

The applicable legal principles are well established. Under section 1140, the trial court is precluded from discharging the jury without reaching a verdict unless both parties consent or "unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." ▮ We have explained that "[t]he determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' [Citation.]" (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 775; see *People* v. *Rojas* (1975) 15 Cal.3d 540, 546 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127]; *People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353].)

▮ No improper coercion occurred here. The trial court made no coercive remarks and exerted no undue pressure on the minority juror to change his vote. (See *People* v. *Rodriguez, supra,* at p. 775.) The court merely made a discretionary determination, based on its examination of the jury, that there remained a reasonable probability the deadlock might be broken following a rereading of the penalty instructions. This determination seems entirely reasonable given the fact that, before announcing the deadlock, the jury had deliberated for only two days and had taken only one ballot, and that several jurors had indicated that such a reinstruction might produce a unanimous verdict.

Defendant argues, however, that it is inherently coercive to refuse to discharge a jury after learning of an 11-to-1 vote favoring the death penalty. We disagree. There is always a *potential* for coercion once the trial judge has learned that a unanimous judgment of conviction is being hampered by a single holdout juror favoring acquittal. In such a case, the judge's remarks to the deadlocked jury regarding the clarity of the evidence, the simplicity

of the case, the necessity of reaching a unanimous verdict, or even the threat of being "locked up for the night" might well produce a coerced verdict. (See *People* v. *Carter, supra,* 68 Cal.2d 810, 816-820, and cases cited.) But the potential for coercion was not realized by anything said or done by the court in this case.

Here, the deadlock proceeding was heard by an assigned judge whose remarks or actions could not have been interpreted by the holdout juror as an agreement with the position taken by the 11 jurors voting for conviction. (See *Carter, supra,* 68 Cal.2d at pp. 816-817.) Moreover, the court made no remarks either urging that a verdict be reached or indicating possible reprisals for failure to reach agreement. We conclude that the trial court did not abuse its discretion in determining that it was reasonably probable the jury could reach a verdict after a rereading of the penalty instructions. (See also *Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 108 S.Ct. 546] [approving supplemental charge to deadlocked jury in capital case, urging jurors to consult with each other with the objective of achieving a unanimous verdict].)

### H. *Disproportionate Penalty*

■ Defendant next asserts the death penalty is disproportionate punishment for his offense. (See *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].) He also urges that we adopt some form of comparative sentencing review, a proposal we have repeatedly rejected. (See *People* v. *Brown, supra,* 46 Cal.3d at p. 462; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1286-1288; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

Defendant points to other published appellate cases in which assertedly more "aggravated" offenses nonetheless resulted in mere life sentences. Here, according to defendant, he committed "only" one murder, and had no prior criminal record. His crimes occurred "during a truly aberrational period in defendant's life," when he was only 21 years old and was experiencing marital and emotional difficulties.

In response, the People observe that defendant robbed and threatened to kill with a shotgun three restaurant employees, and kidnapped one of them; kidnapped, robbed and eventually beat and brutally strangled to death an elderly victim; and, only a few weeks later, attempted to rob, and threatened to kill, two other elderly victims. The nature of, and circumstances surrounding, defendant's offenses bore little resemblance to those involved in disproportionate-punishment cases such as *Dillon, supra,* 34 Cal.3d 441.

(See also *People* v. *Brown, supra,* 46 Cal.3d at pp. 461-462.) We conclude that the death penalty is not disproportionate punishment in this case.

## I. *Assault With a Deadly Weapon*

As previously indicated, defendant was charged with robbing three restaurant employees; the jury was instructed on robbery as well as the lesser offense of assault with a deadly weapon (ADW). The jury found defendant robbed two of the employees, and found him guilty of ADW as to the third (Michael Armstrong). The evidence disclosed that defendant, armed with a shotgun, approached Armstrong and directed him to lie on the floor or "I'll blow your brains out." Although the other two employees were robbed, no money was taken from Armstrong.

Defendant now contends that the ADW count must be set aside because the court did not instruct the jury, sua sponte, on the definition of an assault (CALJIC No. 9.00). That instruction would have advised the jury that assault is an unlawful attempt, coupled with present ability, to apply physical force to another, with the general intent to commit an act which would directly result in such force. (*Ibid.*) According to defendant, a properly instructed jury might have concluded that defendant had no intent to carry out his conditional threat.

The People concede that the foregoing sua sponte instruction should have been given. (See *People* v. *Valenzuela* (1985) 175 Cal.App.3d 381, 392-393 [222 Cal.Rptr. 405].) They contend, however, that the error was harmless because the assault issues were necessarily resolved by the jury, adversely to defendant, in its other findings. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) We disagree.

The jury, although not instructed on the elements of assault, was told that it was a general intent crime requiring only proof of an intent to commit the act declared to be unlawful. The jury, in finding ADW, also found that defendant used a firearm during its commission, a finding which, according to the People, would implicitly include a finding that defendant had the present ability to, and in fact attempted to, apply physical force to his victim to prevent his resistance.

Defendant points out, however, that we have previously held ADW is not a lesser included offense within the crime of robbery with firearm use, for purposes of requiring an ADW instruction. (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 102 [192 Cal Rptr. 748, 665 P.2d 520].) As *Wolcott* states, "the [firearm use] enhancement does not supply the necessary elements of an attempt to inflict violent injury and present ability to do so. The menacing

display of a firearm to intimidate a victim is sufficient to prove use of the firearm under section 12022.5 [citation], but insufficient to prove assault with a deadly weapon [citation]. The use of an unloaded or inoperable gun justifies an enhanced sentence [citation], but . . . does not support a conviction for an assault." (Fn. omitted.)

Thus, the jury's finding of firearm use necessarily implied nothing more than a "menacing display" of a weapon. We cannot assume, from the firearm-use finding alone, that the jury further found defendant had the present ability to, and in fact attempted to, apply physical force to his victim. We conclude that the ADW count should be set aside.

*J. Ruling on Automatic Application to Modify Sentence Under Section 190.4, Subdivision (e)*

The following issue was not presented in the original briefs; we asked for additional briefing once the point arose during our review of the record.

In every case in which a death penalty is returned, section 190.4, subdivision (e), provides in pertinent part that the trial court must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. *The judge shall state on the record the reason for his findings . . . .* [¶] *The judge shall set forth the reasons for his ruling on the application* and direct that they be entered on the Clerk's minutes." (§ 190.4, subd. (e), italics added.)

In the present case, the trial court merely denied defendant's application for modification without stating any reason for his findings or his ruling. ("The motion to reduce the penalty is denied.") The court did state specific reasons for imposing consecutive sentences for defendant's lesser offenses, but the sentencing factors it employed (see rule 421(a), Cal. Rules of Court) were substantially different from those specified in section 190.3.

The People concede the error but argue that, in light of the evidence here, it was harmless. Although we performed a harmless-error analysis in a case in which the trial judge had died during the appeal, we also explained in that case that if the judge had survived, "we would remand for a new hearing on the verdict-modification application simply out of an abundance of caution, since the trial judge's familiarity with the record would enable him to review the application and state reasons for his determination with relatively little delay and expenditure of judicial resources."

(*People* v. *Heishman* (1988) 45 Cal.3d 147, 200 [246 Cal.Rptr. 673, 753 P.2d 629]; see also *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 792-795.)

The judge who tried the present case is alive and apparently available to hear the matter on remand. Accordingly, we believe a limited remand is appropriate here. The trial judge should rehear the motion personally, on the basis of the record certified to this court. If, however, he is unavailable, the motion may be heard before another judge of the same court. (See *People* v. *Brown* (1988) 45 Cal.3d 1247, 1264, fn. 7 [248 Cal.Rptr. 817, 756 P.2d 204].)

The judgment convicting defendant of assault with a deadly weapon is reversed. The judgment of conviction is affirmed in all other respects but the judgment of death is vacated and the cause remanded to the trial court for the limited purpose of redetermining defendant's application for modification of the verdict in accordance with this opinion. If the trial court, upon application of the appropriate standards, denies the application for modification, it shall reinstate the judgment of death. If it grants the application, it shall enter a judgment of life without possiblity of parole. Any subsequent appeal shall be limited to issues related to the modification application. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 794-795.)

Panelli, J., Eagleson, J., Kaufman, J., and Kennard, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it affirms the judgment of the trial court as to guilt and death-eligibility (except as to the conviction for assault with a deadly weapon). With the exception noted, I find no reversible error affecting the verdicts the jury returned or the findings it made.

I dissent, however, from the judgment insofar as it vacates the judgment of the trial court as to penalty. As I shall explain, at the penalty phase the jury was exposed to a "crime" of which defendant had been prosecuted and acquitted —a "crime" that was inadmissible *as a matter of law*. It is hard to determine with certainty why the prosecutor, who urged the jurors to "follow the law," himself violated the law by introducing and arguing evidence of the "crime"; or why the court allowed him to do so and even instructed on the matter; or why defense counsel did nothing to keep the "crime" from the jury. But it is easy to see what flowed from the acts and omissions of prosecutor, court, and counsel: prejudice to defendant and a fatal taint on the verdict of death.

At the penalty phase, the prosecutor introduced in aggravation evidence underlying the "attempted murder" of Deputy Sheriff Chris Smith in

Nevada, including testimony that defendant's rifle discharged in a struggle with Smith and his alleged admission to his grandmother that "I tried to take one with me." As the court and counsel knew from before trial had even commenced, defendant had been prosecuted for, and acquitted of, this offense. The prosecutor presented the "attempted murder" of Deputy Smith in his opening statement as a circumstance justifying imposition of the penalty of death. The court admitted evidence relating to the "crime." The prosecutor called five witnesses to prove the "attempted murder"—two of whom testified about that "crime" and that "crime" alone. He alluded to the "attempted murder" again in his closing argument in asking for the death penalty. The court instructed the jury that it could consider the "crime" (if it found it established beyond a reasonable doubt) in determining whether defendant should live or die, and twice ordered the instruction reread during deliberations in response to requests from the jury. All the while, defense counsel stood by and did nothing.

Penal Code section 190.3 (hereinafter section 190.3) declares in language that is express and unqualified: "*[I]n no event* shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted." (Italics added.) Thus, the statutory provision bars "evidence of prior criminal activity" underlying "an offense for which the defendant was prosecuted and acquitted" *in mandatory and absolute terms as a matter of law.* The provision does not bar merely mention of the "label" the offense bore, as the Attorney General claims. It bars evidence of the *criminal activity and all the surrounding events.*

When I judge his conduct in light of section 190.3, I am compelled to conclude that the prosecutor engaged in separate acts of misconduct by introducing the evidence of the "attempted murder" of Deputy Smith, by presenting it to the jury in his opening statement to support imposition of the penalty of death, and by alluding to it in his closing argument for the same purpose. Of course, it is misconduct for a prosecutor to intentionally introduce statutorily inadmissible evidence. (E.g., *People* v. *Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217].) It is also misconduct to intentionally refer to such evidence in argument. (See, e.g., *People* v. *Ledesma* (1987) 43 Cal.3d 171, 238 [233 Cal.Rptr. 404, 729 P.2d 839] (conc. opn. of Mosk, J.).)

I am also compelled to conclude that the court committed separate errors by admitting the evidence of the "attempted murder" of Deputy Smith, by failing to take any steps to prevent or correct the prosecutor's comments on the "crime," and by instructing and "reinstructing" the jury that it could take the "offense" into account in the determination of penalty. It is, of course, "the duty of the judge . . . to limit the introduction of evidence and

the argument of counsel to relevant and material matters . . . ." (Pen. Code, § 1044; accord, *People* v. *Ashley* (1954) 42 Cal.2d 246, 274 [267 P.2d 271].) Also, " '. . . there is a continuing duty upon the part of the trial court to see to it that the jury are properly instructed upon all matters pertinent to their decision of the cause.' " (*People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153], quoting *People* v. *Keelin* (1955) 136 Cal.App.2d 860, 874 [289 P.2d 520, 56 A.L.R.2d 355].) It is clear on the face of the record that the court here failed to discharge its duties with respect to the evidence of the "attempted murder" of Deputy Smith.

In my view, each of the prosecutor's acts of misconduct and each of the court's errors must be deemed prejudicial.

To begin with, the balance of circumstances in aggravation and circumstances in mitigation was close. To be sure, the aggravating evidence was substantial. But substantial too was the mitigating evidence. It revealed, for example, that defendant was afflicted with various physical and psychological disorders and disabilities, including organic brain damage; he had suffered abuse at the hands of his stepfather and agemates; he had been a good, loving, and hardworking child and was himself a good, loving, and hardworking father; he evidently had no record of criminal activity antedating the Pizza Bowl offenses; and he was barely 21 years old at the time of the crimes here and was then in great emotional turmoil because of a stormy marriage. The closeness of the case is confirmed by the fact that the jurors deliberated over several days before reaching their verdict and for a time stood at deadlock.

Further, the evidence of the "attempted murder" of Deputy Smith carried within itself a marked potential for upsetting the balance of aggravating and mitigating circumstances to defendant's detriment. The threat of prejudice inherent in "other crimes" evidence is substantial and notorious. (See, e.g., *People* v. *Robertson* (1982) 33 Cal.3d 21, 54 [188 Cal.Rptr. 77, 655 P.2d 279] (plur. opn.) [noting "the overriding importance of 'other crimes' evidence to the jury's life-or-death determination"]; *People* v. *McClellan* (1969) 71 Cal.2d 793, 804, fn. 2 [80 Cal.Rptr. 31, 457 P.2d 871] [citing a study showing that "Evidence of a prior criminal record is the strongest single factor that causes juries to impose the death penalty"].) That threat must be deemed to be greater still when, as here, the victim of the "other crime" was a law enforcement officer: such evidence suggests that the defendant is altogether beyond the control of civilized society and can be checked only by means of the ultimate restraint.

In finding no prejudice, the majority conclude that a reasonable juror would not have found beyond a reasonable doubt that defendant attempted

to murder Deputy Smith and would not have then proceeded to use such a finding to support the penalty of death. I cannot agree.

First, in deliberations one or more of the jurors could have found beyond a reasonable doubt that defendant attempted to murder Deputy Smith. The evidence of the "crime" was more than legally sufficient. Surely, on this record we must answer in the affirmative the question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781].)

Contrary to the majority's assertion, the evidence introduced by the prosecution on the "attempted murder" of Deputy Smith did *not* demonstrate that the "circumstances surrounding the shooting" were "ambiguous" or that there was a "substantial chance that the gun discharged accidentally . . . ." (Maj. opn., *ante,* p. 952.) Indeed, the summary of the evidence which they themselves present shows as much.

Also contrary to the majority's assertion, the prosecutor's closing argument did *not* reveal a "lack of emphasis" (maj. opn., *ante,* p. 952) on the "attempted murder" of Deputy Smith. As they themselves concede, in closing argument the prosecutor "emphasized [defendant's] statement to his grandmother that 'I tried to take one with me.'" (*Id.* at p. 949.) This statement, of course, was in his view defendant's admission that he had indeed attempted to murder Deputy Smith.

Finally, contrary to the majority's assertion, the jurors' knowledge that defendant had in fact been acquitted of the "attempted murder" of Deputy Smith would *not* have led them to discount the evidence of the "crime." If they allowed themselves to make reasonable—or better, realistic—assumptions, the majority would be compelled to conclude that such knowledge would be likely to cause the jurors to adopt the attitude, "Defendant 'beat the rap' once before—he will not do it again."

Second, in deliberations one or more of the jurors could have used the "attempted murder" of Deputy Smith to support the penalty of death. The majority appear to assume that the evidence of the "crime" is not of critical importance on the facts of this case. It is manifest, however, that the prosecutor treated this evidence as crucial: he presented the "attempted murder" in his opening statement and alluded to it in his closing argument, and called five witnesses to prove the "crime"—two of whom testified about that "crime" and that "crime" alone. "There is no reason why we should treat this evidence as any less 'crucial' than the prosecutor—and so presumably

the jury—treated it." (*People* v. *Cruz* (1964) 61 Cal.2d 861, 868 [40 Cal.Rptr. 841, 395 P.2d 889].) Indeed, the jury itself gave clear indication that it considered the evidence of critical importance to its determination: during deliberations, it once requested a rereading of the charge containing the erroneous "other crimes" instruction and once requested a rereading of the erroneous instruction alone. (See *People* v. *Ford* (1964) 60 Cal.2d 772, 798 [36 Cal.Rptr. 620, 388 P.2d 892].)

Accordingly, I am of the opinion that there is a reasonable possibility that each of the prosecutor's acts of misconduct and each of the court's errors marginally affected to defendant's detriment the jury's weighing of aggravating and mitigating circumstances and its consequent determination of the appropriateness of death. Reversal of the judgment as to penalty is therefore required. (See generally *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135]; *id.* at pp. 463-470 (conc. opn. of Mosk, J.).)

It may well be, as the majority appear to conclude, that defense counsel "waived" any claims challenging the prosecutor's misconduct and the court's admission of the evidence by failing to make any objection whatever, express or implied. But to my mind, "waiver" merely denies a defendant the right to have his claims addressed by us on appeal—it does not deprive us of the authority to reach those claims in the interest of justice in a capital case In any event, claims attacking the court's instructions are not waived by counsel's failure to object. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372]; see Pen. Code, § 1259.) This is so even when, as here, no objection was made to the evidence that is the subject of the challenged instruction. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 600 [138 Cal.Rptr. 885, 564 P.2d 1203].)

Even if we could not or would not consider the acts of misconduct and the serious errors identified above, we would be required to reverse the judgment of death on a separate and independent constitutional ground.

Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has a right to the assistance of counsel. (E.g., *Strickland* v. *Washington* (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 691-692, 104 S.Ct. 2052] [construing the federal Constitution]; *People* v. *Ledesma, supra,* 43 Cal.3d at p. 215 [construing both the federal and state Constitutions].) The right entitles the defendant not to some bare assistance but rather to *effective* assistance. (*Strickland* v. *Washington, supra,* at p. 686 [80 L.Ed.2d at p. 692]; *People* v. *Ledesma, supra,* at p. 215.)

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693]; accord, *People* v. *Ledesma, supra,* 43 Cal.3d at p. 216.)

"First, the defendant must show that counsel's performance was deficient." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693]; accord, *People* v. *Ledesma, supra,* 43 Cal.3d at p. 216.) Specifically, he must establish that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 688 [80 L.Ed.2d at pp. 693-694]; accord, *People* v. *Ledesma, supra,* 43 Cal.3d at p. 216.)

"Second, the defendant must show that the deficient performance prejudiced the defense." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693]; accord, *People* v. *Ledesma, supra,* 43 Cal.3d at p. 217.) "In certain . . . contexts, prejudice is presumed." (*Strickland* v. *Washington, supra,* at p. 692 [80 L.Ed.2d at p. 696]; accord, *People* v. *Ledesma, supra,* at p. 217.) Generally, however, it must be "affirmatively prove[d]." (*Strickland* v. *Washington, supra,* at p. 693 [80 L.Ed.2d at p. 697]; accord, *People* v. *Ledesma, supra,* at p. 217.) To meet this burden, "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland* v. *Washington, supra,* at p. 694 [80 L.Ed.2d at p. 698]; accord, *People* v. *Ledesma, supra,* at pp. 217-218.) A "reasonable probability" is not a probability that counsel's failings "more likely than not altered the outcome in the case," but simply "a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* at pp. 693-694 [80 L.Ed.2d at pp. 697-698]; see *People* v. *Ledesma, supra,* at p. 218 [to similar effect]).

To my mind, defendant has established his claim of constitutionally ineffective assistance of counsel beyond any doubt whatever.

First, he has shown that defense counsel's performance was deficient. Failure to make any attempt to keep from the jury evidence of the "attempted murder" of Deputy Smith must be judged to be "representation [falling] below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 688 [80 L.Ed.2d at pp. 693-694].) There was every reason to act and no reason to refrain from acting. Success was certain—the evidence was inadmissible as a matter of law—and could be obtained at absolutely no cost to the defense. Moreover, as stated above the prejudice that the evidence threatened was

substantial and notorious. (See, e.g., *People* v. *Robertson, supra,* 33 Cal.3d at p. 54; *People* v. *McClellan, supra,* 71 Cal.2d at p. 804, fn. 2.)

The majority assert that "we have seldom found a mere failure to object to evidence or argument as reflecting counsel's incompetence." (Maj. opn., *ante,* p. 951.) The record, however, requires that we make such a finding here. It plainly reveals that counsel's failure to act was grounded in their inexcusable ignorance of the express and unqualified prohibition section 190.3 has declared against "evidence of prior criminal activity" underlying "an offense for which the defendant was prosecuted and acquitted."

Second, defendant has shown that counsel's deficient performance prejudiced the defense. I am inclined to believe that prejudice should be presumed in the context of this case. I need not, however, decide the issue. This is because defendant has proved prejudice affirmatively. But for counsel's failings, there is a reasonable probability that the result would have been different: the misconduct and errors identified above would not have occurred and the prejudice they engendered would not have arisen. By allowing such prejudicial misconduct and errors to infect the proceeding, counsel's deficient performance "undermine[s] confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].) Accordingly, the verdict of death should not stand.

For the foregoing reasons, I would reverse the judgment as to penalty.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied August 10, 1989.