Filed 4/16/13  P. v. Donis CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B235417 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. YA078947) |
| CARLOS HUMBERTO ARIAS DONIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mark S. Arnold, Judge.  Affirmed as modified.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Carlos Humberto Arias Donis (Donis) used a machete to kill one man and severely injure a second man.  According to Donis, he acted in self-defense.  He was convicted of second degree murder (count 1) (Pen. Code, § 187, subd. (a)),[1] attempted murder (count 2) (§§ 664, 187, subd. (a)), and aggravated mayhem (count 3) (§ 205).  As to counts 1 through 3, the jury found true the allegation that Donis used a deadly or dangerous weapon within the meaning of section 12022, subdivision (b)(1).  As to counts 2 and 3, the jury found true the allegation that Donis inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).  On count 1, Donis was sentenced to 15 years to life, plus one year for the deadly weapon enhancement.  With respect to count 3, the trial court imposed a term of life with the possibility of parole plus one year for the deadly weapon enhancement and three years for the great bodily injury enhancement.  The sentence on count 3 was ordered to run consecutive to the sentence on count 1.  For count 2, Donis received a sentence of seven years plus a one-year enhancement for the use of a deadly or dangerous weapon and a three-year enhancement for inflicting great bodily injury.  The sentence on count 2 was ordered to run concurrent with the sentence on count 3.  Along with various fines, the trial court imposed a single $30 criminal conviction assessment pursuant to Government Code section 70373.

On appeal, Donis contends that the trial court tainted the verdict by (1) invading the mental process of the jury when it asked questions to determine why the jury was in a deadlock; (2) requiring a second closing argument on self-defense; (3) coercing Juror No. 5 into voting guilty; and (4) giving an improper and unduly coercive *Allen* charge[2] to the jury.  In addition, Donis argues that the separate punishments on counts 2 and 3 violate section 654.  The People request that we strike the great bodily injury enhancement imposed on count 3, and that we impose $30 fees pursuant to Government Code section 70373 on all three counts.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    The term is derived from instructions given to a deadlocked jury in *Allen v. United States* (1896) 164 U.S. 492 (*Allen*).

Upon review of the evidence, we conclude that the sentence on count 2 for attempted murder should have been stayed pursuant to section 654 because that offense and the aggravated mayhem offense were part of a single, indivisible transaction. Per the People's request, we strike the great bodily injury enhancement imposed on count 3 and impose $30 Government Code section 70373 assessment on each count. As modified, the judgment is affirmed.

**FACTS**

**The People's Case**

*Background*

In August 2010, Donis lived in a three-bedroom house in the City of Lawndale. He slept in the living room. Damian Ramos (Ramos) shared one of the bedrooms with Fernando Cruz (Cruz) and Juan Lopez (Lopez). Marinelli Martinez slept in the second bedroom. The third bedroom was shared by Ruben Donis (Ruben) and Obdulio Marroquin. Magdalena Ortiz (Ortiz), Israel Donis (Israel) and their three children lived in the house's converted garage. A person named Daniel slept in the linen closet.

Ramos and Lopez were childhood friends from Guatemala. They did not have any problems with Donis, nor did Cruz. Neither Ramos, Lopez nor Cruz carried weapons or had them in their room. According to Ortiz, Donis played the radio loudly every night for a few second or minutes. She found it annoying. Cruz, Lopez and Ramos, however, never complained. Ramos testified that Donis was friendly, even when he was drinking alcohol.

About a month before August 24, 2010, Donis showed Lopez a machete. Then, a week before August 24, 2010, Donis showed it to Ramos. Lopez was about five feet one or two inches and weighed 128 pounds. Ramos was five feet tall and weighed 145 pounds.

Marco Antonio Mendoza (Mendoza) was Donis's next door neighbor.

3

*The events of August 24 and August 25, 2010*

Early on the morning of August 24, 2010, Cruz, Lopez and Ramos all went to work. Donis went to work with his boss, Marciano Mederos (Mederos), as a gardener.

When Ramos returned home at 5:30 p.m., he saw Donis in the front yard and they exchanged greetings. Donis said he was resting. His breath smelled of beer and his eyes were red. Ramos went to his room at about 8:30 p.m. and fell asleep.

Lopez returned home at about 5:30 p.m. and rested. He saw Donis and said, "What's up," and Donis said the same. After Lopez took a bath, he went to his room and watched television. He ate dinner at 7:30 or 8:00 p.m. and then returned to his room. He watched a soap opera with Cruz and Ramos. None of them had any arguments or fights with Donis. Cruz kept walking in and out of the bedroom. Ramos was asleep by the time that Lopez fell asleep at approximately 9:30 or 10:00 p.m. At one point, Ortiz watched television, too. At 11:00 p.m., she went to sleep.

At approximately 12:40 a.m., on August 25, 2011, Mendoza arrived home and saw Donis speaking on a cell phone. Donis was wearing a white cowboy hat, cowboy boots, black pants, and a white button-up shirt. He called to Mendoza and approached him. Donis asked how Mendoza was and appeared to be normal and calm. Mendoza asked how Donis was. He said he was "not really good because he got in trouble with the guy" and he was expecting the police to look for him and pick him up. Mendoza saw Donis walk to his house but did not see him go in.

At about 1:00 a.m., Lopez awakened to what sounded like someone hitting another person with a belt. He heard the noise about 10 times. Then he saw Donis using all of his strength to hit Cruz with a machete. At the time, Cruz was lying face up on his bed with his arms over his chest. Lopez then saw Donis hit Ramos with the machete about three or four times. Like Cruz, Ramos was also lying in bed.

Lopez exited through the door leading to the converted garage and shouted to Ortiz that Donis had gone crazy and was going after Cruz with a machete. Lopez left the bedroom and went to call the police. Ortiz and Israel entered the bedroom. Ortiz told Donis to stop hitting her nephew, Cruz. In response, Donis ordered Ortiz to stay out of it

4

and threatened her.  After the threat, Ortiz and Israel left the bedroom.)~  Lopez returned and saw that Cruz and Ramos had been "all cut up."  Donis hit Cruz once or twice more and ran away.  Donis knocked on Ruben's door and said he was leaving because "he had made a real mess."

Ortiz went back to the bedroom and saw Cruz convulse and jerk on the bedroom floor and stop moving.  She began screaming.  Israel reentered the bedroom and saw blood squirting from Cruz's neck and heard him choking.  Ramos was moving around on the bed.  Mendoza called 911 after Ortiz went outside and yelled for help.

When deputies from the Los Angeles County Sheriff's Department and paramedics arrived at the scene, Cruz was dead and Ramos was severely injured.  Ramos was taken to the hospital.

*The investigation*

The house was cleared and searched.  The deputies did not find any weapons in the bedroom where Cruz and Ramos were attacked.

Lopez told the deputies that Donis might be at Mederos's home, which was only a couple of blocks away.  Deputies went there and woke Mederos up.  He consented to a search of his house and backyard.  During the backyard search, Deputy Casey Cheshier saw Donis trying to climb over a block wall with barbed wire on top.

Donis eventually surrendered himself.  When Deputy Juan Meza asked Donis his name, Donis said, "Casper."  Prompted to provide his real name, Donis said that it was "Carlos."  He said that that he had buried the machete in the sand, and that he knew he was going to jail.  A criminalist for the Los Angeles County Sheriff's Department found Donis's cowboy hat in a Chevy Suburban parked in Mederos's backyard.  The hat had blood on the rim.  Also on Mederos's property, a deputy found the blood stained machete in a pile of sand.  The machete belonged to Mederos.  It was for cutting branches at work. He did not give Donis permission to take it.

Deputy Cheshier transported Donis to the police station.  Donis was wearing a brown jacket, white shirt covered with blood, dark pants and cowboy boots.  It appeared to Deputy Cheshier that Donis was "high."

5

*Ramos's injuries; Cruz's autopsy*

Dr. Angela Neville, a trauma surgeon, treated Ramos. He was in the hospital for a month and five or six days. He had two stomach surgeries and surgery on his face. The machete gave him permanent scars on his scalp, face, arms, legs and back. His right eye was cut. It watered and caused him pain every day.

The autopsy on Cruz was performed by Dr. Yong-Son Kim of the Los Angeles County Coroner's Office. She testified that Cruz was five feet, six inches tall and weighed 125 pounds. Cruz suffered 16 sharp force injuries. The injuries to Cruz's hands were consistent with being defensive wounds. They were also consistent with Cruz being passive. Dr. Kim concluded that the cause of death was multiple sharp force injuries.

**The Defense Case**

According to Donis, he did not plan the attack and never intended to kill Cruz or Ramos.

Donis had many disagreements with Cruz, Lopez and Ramos. When asked about the area of disagreement, Donis stated: "I don't know. There was a lot of jealousy." One day when they were smoking marijuana, Donis was informed by Cruz that he had killed two people in Mexico. Donis believed that Cruz was prone to violence. A few weeks before the attack. Donis came home drunk and went to bed. When he woke up, he had a cut on his right temple. A few days before the attack, Cruz confessed that he had cut Donis and said, "I already started you out. I'm going to finish you up."

On August 24, 2010, Donis worked at a job site in Palos Verdes. Afterwards, he went to Mederos's house for dinner. Donis went home between 7:00 and 8:00 p.m. and stayed for about half an hour. Someone bought him some beer. He did not see Cruz, Lopez or Ramos. Eventually, Donis decided to go to a bar. He ingested some "crystal," which he said did not affect him. At the bar, he drank three or four beers. Upon returning home, he listened to some music while lying down. Ortiz was in the kitchen. Cruz walked out of his bedroom and went to his car. Upon returning, he went into the backyard. Donis went out to the street. He came back into the house at about 11:00 or

6

11:30 p.m. Ortiz gave him four cigarettes. Donis went back outside and smoked. He saw Mendoza and they spoke for five or 10 minutes.

Mendoza asked Donis how he was. He said he had a lot of problems with the police. He had a $250 ticket for using the Metrolink without paying. The police told him that if he did not pay the tickets, he would be arrested and deported. He had also received a ticket for being drunk.

Donis went back inside. He spoke to the "man in charge of the house" and they smoked a cigarette together. When Donis said he was going to listen to music, the man shook his head and told him to go to sleep. Donis lay down and turned on music for a while. At the time, he did not feel any effects from the "crystal" or beers.

Cruz entered the living room and stared at Donis. They began arguing and Donis stood up from the sofa. Cruz said he had killed two people before and that Donis would be number three. At some point, Lopez and Ramos entered the living room. Cruz hit Donis twice in the stomach with a fist. Lopez and Ramos started laughing. Cruz pulled a six inch knife out of his pocket and showed it to Donis. It was the same knife that Cruz had used to cut Donis's face.

Lopez and Ramos started moving in. Donis took the machete out from under the sofa. He had taken it from Mederos to cut branches. Ramos moved closer to Donis, and Cruz repeated his threat to kill Donis. He thought the men were going to take the machete away and kill him with it. The four of them moved into the bedroom that Cruz, Lopez and Ramos shared with each other. The defense attorney asked Donis, "And how was it you got in the bedroom?" He replied: "I don't know how everything went. Everything was a big mess. It all happened." Donis did not see Lopez and Ramos with any weapons, but he thought that they had knives in their pockets. Asked how he felt when "this was happening," Donis said he was afraid. When asked what he was afraid of, he said: "I don't know. Well, everything was very—No. I didn't want to do anything. Everything was almost required."

He ran away when he saw Ortiz. He yelled at her to "call the fire department or something. . . . To help them." After he left the house, he ran up the street and entered

7

Mederos's property. He was arrested and spoke to a detective. Donis was asked if he recalled telling a detective that he was thinking about killing Cruz and Ramos while he was outside watering the lawn on the night of the incident. Donis said he did not remember.

**The People's Rebuttal**

Detective Margarita Barron of the Los Angeles County Sheriff's Department interviewed Donis. He told her that while he was outside watering the lawn, he was thinking about killing Cruz. Donis never said that Cruz claimed to have killed two people in Mexico or that Cruz had confessed to cutting Donis the week before. Donis said he told Mendoza that the police would be coming for him "[b]ecause he was going to get in a fight." There was no mention of a Metrolink ticket or an arrest. According to Detective Barron, Donis said that Cruz had been asleep on the couch in the living room waiting for Donis to go to sleep and be vulnerable to attack.

## DISCUSSION

### I. The Trial Court did not Coerce a Guilty Verdict.

Donis maintains that the trial court coerced a guilty verdict when it asked about the number and direction of the votes, when it asked about the issue causing the deadlock, when it required the attorneys to give a second closing argument on self-defense, when it admonished Juror No. 5 that he needed to listen to the other jurors and act as part of the jury team, and when it gave the jury an improper *Allen* charge. Underlying these contentions is Donis's belief that the evidence supported a finding of self-defense. These arguments fail.

#### A. Relevant facts.

##### 1. The jury note advising of a deadlock; the trial court's response.

The jury began deliberating on Thursday, July 21, 2011, at 4:20 p.m. In the afternoon of Tuesday, July 26, 2011, the jury sent a note to the trial court stating: "We cannot unanimously agree on any given charge or verdict. [¶] We have varying views about the self-defense issue, which has an impact on all the verdicts." The trial court told

8

counsel it intended to ask the jurors about the vote, and whether they wanted additional argument.

2. <u>The trial court's initial inquiry into the deadlock.</u>

The jury was called into the courtroom. The trial court asked the foreperson, Juror No. 11, if the jury took a vote on the murder count. Juror No. 11 said there was a preliminary vote on Friday. The trial court then said, "All right. I don't want to know guilty or not guilty. I strictly want to know numbers. What were the numbers on Friday? [¶] How many votes did you take on Friday?" In response, Juror No. 11 said, "Three on first degree." The trial court reiterated that it did not "want to know guilty versus not guilty." It added: "I want to know numbers, and before I ask you numbers, how many votes did you take on Friday, the first full day of deliberations?" Juror No. 8 interjected and said, "We took all [12] everyone, voted once." Juror No. 11 concurred and said, "One time." The trial court asked: "What were the numbers? [¶] [Three] and [nine]?" Before Juror No. 11 could answer, Juror No. 8 said, "First degree was three. Second degree was—" The trial court interrupted Juror No. 8 and said, "Just give me numbers, please. [¶] I want to deal with the foreperson. Do you not understand, Juror [No.] 11, what I want?" Juror No. 11 replied: "I'm not fully convinced that I know what you want. We took a count and we put it up on the board. We listed each count, and we put a preliminary—" Interrupting Juror No. 11, the trial court asked if the jury had voted on all three counts. In response, Juror No. 11 said, "Yes."

Continuing on, the trial court said, "Count number 1, what were the numbers? Like if it was nine for guilty and three for not guilty, I don't want to know that. I just want to know strictly numbers. Eight, three, two, what it was." Juror No. 8 said the vote on count 1 was nine, three. But Juror No. 11 said, "Your Honor, we didn't vote like that. We voted based on whether the people were going to vote guilty only." The trial court said, "Let me make it easier on you. You were trying to decide between first degree, second degree, and manslaughter?" Juror No. 11 answered yes. The trial court then asked: "How many were for first degree," "[h]ow many were for second degree" and "[h]ow many were for manslaughter?" Juror No. 11 said three were for first degree, six

9

were for second degree and two were for manslaughter. When the trial court said that the votes added up to eleven, Juror No. 11 said, "One for acquit" and that on Friday the vote did not encompass counts 2 or 3.

According to Juror No. 11, there was another vote on Tuesday. The trial court said: "All right. Count [1], what were the numbers today?" After some colloquy, the trial court asked, "On count 1, you took a vote today?" Juror No. 11 said yes. The trial court said, "All right. How many for first degree?" Juror No. 11 replied, "One." Moving on, the trial court asked, "How many for second degree?" When Juror No. 11 did not answer, Juror No. 8 said, "I can go back and look I guess. [¶] One first degree and one acquit, and we were negotiating between the other two." At that point, Juror No. 11 said, "Eight for second and six for voluntary." The trial court said, "It can only add up to 12. [¶] If you have one, eight, and six, that would be 15." Juror No. 8 interjected and said, "One, six, four, one." The trial court asked if there was a vote taken on second degree murder. Juror No. 11 said no vote was taken. The trial court said, "So . . . you're stuck on the self-defense." Juror No. 11 agreed.

### 3. The jury's divided vote for additional argument.

The trial court asked the jury to go back into the deliberation room and discuss whether "additional argument from the prosecutor and from the defense counsel would be of assistance in reconciling your views on self-defense." As a follow up, the trial court said that he did not want the jury to feel pressured to answer one way or the other. After the jury returned from the deliberation room, Juror No. 11 said nine jurors believed additional argument would help. Based on the vote, the trial court decided to permit additional argument.

### 4. The instruction following additional argument.

After the attorneys provided additional argument, the trial court addressed the jury and said: "Over the evening think about what [the defense attorney and prosecutor] said, and tomorrow when you come in, discuss amongst yourselves how you feel about these issues. [¶] Each of you has a duty to participate in the deliberations, and just as a suggestion, you don't have to follow this, all of you have a feeling one way or the other

10

about self-defense, complete self-defense, imperfect self-defense, or whether self-defense doesn't apply at all. Just as a suggestion each of you get up and tell the other 11 why you feel the way you do. Just discuss it. [¶] But in any event remember you're not an advocate for one side or the other. Both sides are entitled to a fair trial, which means 12 fair-minded, open-minded impartial jurors."

     5.  <u>The juror notes regarding Juror No. 5</u>.

Late Wednesday morning, the trial court held an in chambers conference with the attorneys. The trial court indicated that it had received notes from Jurors No. 8 and 9. According to the notes, Juror No. 5 said he made the decision to acquit before deliberations began, he refused to deliberate and he was isolating himself. The trial court stated: "All right, these are two notes which indicate what appear[s] to be misconduct. I have to investigate. What most concerns me is two jurors have said that this particular juror said he made up his decision before deliberations even began."

     6.  <u>The trial court's investigation of Juror No. 5</u>.

The trial court called jurors No. 1, 3, 8, 9 and 11 into chambers and interviewed them. Afterwards, Juror No. 5 was interviewed.

The trial court asked if Juror No. 5 remembered that the jurors were instructed that they were required to keep an open mind throughout the trial and not form any opinion or express any opinion. He said yes, and that he believed he had followed that instruction. The trial court asked if on Monday Juror No. 5 ever said that he had made up his mind before deliberations began. In response, Juror No. 5 said, "There was a time . . . I used the wrong words. That's [when] . . . I made that comment."

Juror No. 5 said he was trying to listen with an open mind but he wanted to be taken off the jury because the other jurors were frustrated with him, they were calling him names and he was feeling "very, very pressured." The trial court said that Juror No. 5's desire to be off the jury was not a legal reason to remove him and reminded him he was required to be "fair-minded and impartial and discuss the case with the other jurors." Juror No. 5 detailed some of his conflict with the other jurors. In response, the trial court said, "All right. You and the other eleven jurors have an absolute obligation" "to discuss

11

the case fully." It added that "[e]verybody has to respect what everybody else says" and "you all have the obligation of discussing the case fully and deliberating" and "talking about the evidence and talking about the jury instructions and considering the arguments of counsel." The trial court explained that "[i]t is a violation of your oath" to "come in with a set opinion and not be willing to listen to what any other juror is saying." In his defense, Juror No. 5 said he was "not doing that."

The trial court asked if Juror No. 5 ever said he was for acquittal and was not going to change his mind. He replied that if "I did, I said it out of frustration." The trial court asked, "So, if you said it, you didn't mean it?" Juror No. 5 said, "That's what I'm trying to say, yes, but I'm not going to say I did not say that." The trial court asked if Juror No. 5 meant it. He said, "Well, for that short time I probably did." He then said that he had "changed since that."

The trial court found that Juror No. 5 was willing to deliberate and therefore not guilty of misconduct.

7. The final instruction.

At 2:25 p.m., the jury was brought back into the courtroom. The trial court stated: "All right. Folks, I know you had indicated yesterday that you were deadlocked, but it appears to me after you've heard the arguments of counsel that there is a reasonably good chance you [can] arrive at a decision one way or the other. I want to remind you all of something. Some of you may recall this, some of you may have forgotten it, but it's very important, it's very, very important that all twelve of you . . . that are in the jury deliberation room, that you all have an open mind and that you treat each other respectfully. If two jurors have a disagreement, it doesn't do any good to start calling names; that accomplishes nothing. So, I am going to send you back in there. Listen to each other. Listen to what each other has to say. Consider what each other has to say. Discuss the case fully, intelligently, and treat each other with kindness and respect. Agreed?" The jurors agreed by nodding their heads in the affirmative. The trial court also stated: "You know sometimes deliberations are more difficult in some cases than others, but nevertheless, you're a team, and . . . you have to get through this one way or

12

another.  All right?  But just—It's better for everybody if everybody treats each other with respect and with an open mind and an objective mind."

        8.  <u>The verdict</u>.

The jury was sent back to the jury room at 2:27 p.m.  It recessed at 2:57 p.m. for an afternoon break.  Deliberations were recommenced at 3:14 p.m.  At 3:57 p.m., the jury sent a note to the trial court asking about the special allegations in the verdict form.  At 4:29 p.m., the trial court informed the jury that it had to find the special allegations true or not true.  At 4:34 p.m., the jury reentered the jury room.  Ten minutes later, the jury emerged and Juror No. 11 said that the jury had reached a verdict.

**B.  Preliminary discussion:  there was insufficient evidence of self-defense.**

Donis suggests that he had a viable claim for self-defense that would have swayed the jury if it had not been coerced.  The record is to the contrary.

Homicide is justifiable if a defendant acted in perfect self-defense. To establish this defense, the evidence must establish that the defendant actually and reasonably believed that committing homicide was a necessary response to a danger of death or great bodily injury.  (*People v. Randle* (2005) 35 Cal.4th 987, 991, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)  The "belief in the need to defend must be objectively reasonable" and "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. . . .'" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083.)  But when a jury finds that a defendant held an "'honest but unreasonable belief [that it was necessary] to defend oneself against imminent peril to life or great bodily injury," he or she may be convicted of voluntary manslaughter in "imperfect self-defense."  (*People v. Blakeley* (2000) 23 Cal.4th 82, 88; § 192.)  Voluntary manslaughter is "the unlawful killing of a human being without malice."  (§ 192.)  "[I]mperfect or unreasonable self-defense 'is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder.'" (*In re Walker* (2007) 147 Cal.App.4th 533, 537.)

The doctrine of imperfect self-defense establishes that the "[f]ear of future harm— no matter how great the fear and no matter how great the likelihood of the harm—will not

13

suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" . . . [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.] Put simply, the trier of fact must find an actual fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

"The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules. . . . First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury; thus '[a] misdemeanor assault must be suffered without the privilege of retaliating with deadly force.' [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 380.)

Under the version of events presented by Donis, Cruz issued murder threats, punched Donis several times and brandished a six-inch knife in the living room. Donis thought Lopez and Ramos had knives in their pockets, and also thought that the three men would take the machete and kill Donis with it. Donis never testified that Cruz actually tried to cut Donis with the knife while they were in the living room. Further, Donis never explained what happened when the four men went into the bedroom shared by Cruz, Lopez and Ramos. Thus, there is no evidence of an imminent threat to Donis while he was there. Even if there was an imminent threat of harm, the force used by Donis exceeded that which was necessary for self-defense. The witnesses testified that Donis kept hitting Cruz and Ramos with the machete when they were lying on their beds in defenseless positions, and the injuries they suffered established that Donis kept hitting them long after they posed any threat. The evidence was insufficient to exonerate Donis or knock his homicide down to manslaughter.

14

**C. The trial court's inquiries into the deadlock do not require reversal.**

A trial court has a "responsibility of assuring that a verdict is rendered," except as specifically provided by statute. (*People v. Carter* (1968) 68 Cal.2d 810, 815.) Accordingly, once a cause is submitted, a deadlocked jury cannot be discharged unless, at a time "the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140; *People v. Pride* (1992) 3 Cal.4th 195, 265 (*Pride*) ["The court may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement"].) Our Supreme Court has explained that "'[t]he determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." [Citations.]' [Citations.]" (*People v. Sheldon* (1989) 48 Cal.3d 935, 959 (*Sheldon*).) When attempting to determine whether the jury can agree, a trial court can make a neutral inquiry about the numerical division of the jurors. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 776 (*Rodriguez*).)[3]

An appellant's claim that "the jury was pressured into reaching a verdict [by the trial court] depends on the particular circumstances of the case. [Citations.]" (*Pride*, *supra*, 3 Cal.4th at p. 265.) Thus, when reviewing a coercion claim, we examine "whether or not the court's remarks in sending the jury back for further deliberations indicate[] an opinion on his part as to the guilt or innocence of the defendant, and

---

[3]    In connection with federal trials, there is a different rule. Pursuant to *Brasfield v. United States* (1926) 272 U.S. 448, 450, a federal court must not inquire about the numerical division of a jury at all. A violation of the rule mandates reversal. "[T]he *Brasfield* rule is not a matter of federal constitutional law." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1254 (*Johnson*).) As the United States Supreme Court explained, *Brasfield* was an exercise of the court's supervisory powers. (*Lowenfield v. Phelps* (5th Cir. 1988) 484 U.S. 231, 240 (*Lowenfield*).) It made "no mention of the Due Process Clause or any other constitutional provision. The Federal Courts of Appeal have uniformly rejected the notion that *Brasfield's per se* reversal approach must be followed when reviewing state proceedings on habeas corpus. [Citations.]" (*Lowenfield*, *supra*, at p. 240, fn. 3.)

whether the court creates the impression that in his mind the jury ought to convict." (*People v. Diaz* (1962) 208 Cal.App.2d 41, 50.)  A trial court can send a jury back to the deliberation room after learning which way the jurors are voting.  (*Pride*, *supra*, at p. 265; *Sheldon*, *supra*, 48 Cal.3d at p. 959.)  But there "is always a *potential* for coercion once the trial judge has learned that a unanimous judgment of conviction is being hampered by a single holdout juror favoring acquittal."  (*Ibid*.)

Donis did not object to the trial court's inquiries, so his contentions have been waived.  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038 [by failing to object to the trial court's handling of scheduling matters with the jury, the defendants "forfeited their state law claim that it interfered with the jury's deliberations and coerced a verdict" and they "also . . . forfeited their related constitutional claims"].)  In any event, as we discuss below, we find no basis to reverse.

The trial court asked Juror No. 11, the foreperson, for the numerical division of the votes and specifically said it did not want to know guilty or not guilty.  But Juror No. 11 and Juror No. 8 did not understand what the trial court was trying to elicit.  They both told the trial court that three jurors voted for first degree murder.  When Juror No. 11 could not state a neutral division of votes because the jury only took guilty votes, the trial court asked how many jurors voted guilty for first degree murder, second degree murder and manslaughter.  As a result, the trial court learned that on both Friday and Tuesday, 11 jurors wanted to convict Donis of a crime and one juror had voted to acquit him. It also learned the number of guilty votes for each type of homicide.  Subsequently, the trial court asked Juror No. 11 if the jury was stuck on self-defense.  Juror No. 11 said yes. Finally, the trial court asked the jurors to discuss amongst themselves whether more argument on self-defense would be helpful.  When nine said they thought it would be helpful, the trial court allowed more argument.

Based on the full context of the trial court's initial inquiries, we conclude that they did not coerce the jury to reach a verdict.  Like the bench officer in *Pride*, the trial court never commented on the evidence or status of the votes.  (*Pride*, *supra*, 3 Cal.4th at pp. 265–266 [the direction to continue jury deliberation was not error].)  In the beginning,

16

the trial court repeatedly stated it did not want to know how many for guilty or not guilty. The only reason the trial court later asked how the jurors voted was because Juror No. 11 could not provide a numerical division. The colloquy sent the message that the particular direction of voting was not relevant. (*Id.* at p. 265 [the trial court strongly suggested that the status of the vote was irrelevant].) Nor were constraints placed on the jury. For example, the trial court "made no remarks either urging that a verdict be reached or indicating possible reprisals for failure to reach agreement." (*Sheldon*, *supra*, 48 Cal.3d at p. 960.) It bears mention that in *Johnson*, the trial court's inquiry motivated a juror to disclose that 11 jurors favored a death verdict. (*Johnson*, *supra*, 3 Cal.4th at p. 1254.) Regardless, *Johnson* upheld the trial court's decision to require a deadlocked jury to continue deliberating. This was in part because "[n]othing in the trial court's comments remotely can be construed as implying a desire that the holdout juror capitulate to the majority." (*Ibid.*) All the more so, the same can be said here. Because the jury was so fractured—one voted for first degree murder, six voted for second degree murder, four voted for manslaughter and one voted to acquit—the jury could not have believed that the trial court wanted them to reach a particular verdict. Moreover, the evidence of guilt was overwhelming; there were witnesses to Donis's homicide and the testimony and evidence were inconsistent with self-defense. In sum, any violation of *Rodriguez* was harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) because it is not reasonably probable that a result more favorable to Donis would have been reached in the absence of that error. (*Ibid.*)

In urging reversal, Donis posits that the trial court erred because it essentially ordered the jury to divulge its internal disagreements and therefore failed to protect the jury's right to secrecy. Also, he contends that when the trial court asked for the exact vote in terms of guilt and innocence, and the issue causing the deadlock, it essentially told the jurors that their thought processes and assessments of the witnesses and evidence were not secret.

Jury deliberations are supposed to remain private and secret. The "primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from

improper influence." (*United States v. Olano* (1993) 507 U.S. 725, 738.) "Secrecy affords jurors the freedom to engage in frank discussions, free from fear of exposure to the parties, to other participants in the trial, and to the public. [Citations.]" (*People v. Engelman* (2002) 28 Cal.4th 436, 442.) As a general rule, no one has a "'"'"right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror."'"'" (*Id*. at p. 443.)

The trial court did not invade the mental process of the jury by inquiring into the issue causing the deadlock. Though Donis suggests that the trial court proactively elicited that information, the record establishes that the jury voluntarily informed the trial court that divergent views on self-defense had prevented it from reaching a unanimous verdict. Nor did the trial court invade the mental process of the jury by asking how many jurors voted guilty on first degree murder, second degree murder and manslaughter. By asking those questions, the trial court did not elicit or receive information about how individual jurors or the jury as a whole had assessed the credibility of specific witnesses or the weight of particular evidence. At most, the trial court learned that a majority of jurors believed a crime was committed while one of the jurors did not. Thus, the jurors could not have been afraid that the content of their discussions would be exposed to the parties or anyone else.[4]

### D. Additional closing argument on self-defense.

According to Donis, a trial court may not allow additional closing argument when a deliberating jury informs the trial court that there is an issue on which it cannot agree. He argues that the procedure employed by the trial court violated his constitutional right to due process and a fair trial. This same argument was defeated by *People v. Young* (2007) 156 Cal.App.4th 1165 (*Young*). In *Young*, the court held that it was proper to ask the jury if additional argument would be helpful, and then to allow additional argument,

---

[4]     In his opening brief, Donis suggests that when the trial court made its inquiries, it committed structural error requiring automatic reversal. He failed to develop this argument. We deem the argument waived. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)

18

when, as here, there were no coercive instructions given, the trial court did not indicate a preference for a particular result, and both sides were given an equal opportunity to argue. (*Id*. at p. 1171.) Given *Young*, we easily conclude that the trial court acted well within its discretion.

### E. The inquiry involving Juror No. 5.

A trial court has a "duty to conduct a reasonable inquiry into juror misconduct consistent with defendant's right to a fair trial. [Citation.]" (*People v. Barber* (2002) 102 Cal.App.4th 145, 150.) "[T]he decision whether (and how) to investigate rests within the sound discretion of the court. [Citations.]" (*People v. Engelman, supra,* 28 Cal.4th at p. 442.) "[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*).) The investigation "'must be conducted with care so as to minimize pressure on legitimate minority jurors.' [Citation.]" (*People v. Haskett* (1990) 52 Cal.3d 210, 238 (*Haskett*).)

Donis contends that the trial court committed the following errors during its investigation of Juror No. 5: it admonished Juror No. 5 in a manner suggesting that he had not honored his obligations as a juror; it repeatedly reminded Juror No. 5 of his oath to deliberate but failed to mention that he had a right to disagree with the majority and otherwise failed to craft inquiries to safeguard that right; by not investigating other jurors for their refusal to consider Juror No. 5's viewpoint, the trial court gave the impression that it was siding with the majority; instead of allaying Juror No. 5's fears about the inquiry, the trial court implied that it believed Juror No. 5 had prejudged the case; and the

19

trial court interfered with Donis's reasonable opinion of CALCRIM No. 224.[5]  According to Donis, reversal is required because the investigation was coercive in light of the analysis employed in *Haskett*.

In *Haskett*, the defendant argued that the "court proceedings in relation to Juror Lizana were fatally coercive."  (*Haskett*, *supra*, 52 Cal.3d at p. 237.)  The *Haskett* court disagreed.  There was no evidence that Juror Lizana was identified as the only holdout against the death penalty, nor was there evidence that the trial court knew the numerical split of the jury's vote.  At no time did the trial court suggest that Juror Lizana was disobeying his oath.  Rather, it "was discreet and sensitive to allay any fears [Juror] Lizana might have had as to the purpose of the inquiry."  (*Id*. at p. 238.)  Moreover, the record belied the "defendant's claims that [Juror] Lizana was identified and 'berated' for not obeying his oath, that the trial judge suggested she 'believed' the foreman's note accusing [Juror] Lizana of disobeying her orders, and that, by her answers and instructions, the trial judge 'implied that she agreed with the jurors who were voting for death.'"  (*Id*. at pp. 238–239.)  The court rejected the defendant's claim that the "instructions had 'the ring of flat orders not to vote for life.'"  (*Id*. at p. 239.)  It found that "the judge's comments expressed a concern not to impose any view on [Juror] Lizana and indicate that the judge was sensitive and concerned to protect [Juror] Lizana's right to vote for life[.]"  (*Ibid.*)

Donis highlights that the trial court knew of the jury's division and that Juror No. 5 was the sole holdout.  It also knew that the issue causing the deadlock was self-

---

[5]      CALCRIM No. 224 provides: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

20

defense. Under these particular circumstances, Donis maintains that the trial court's questions transgress *Haskett*. But nothing in *Haskett* establishes that it would have decided the case differently had the trial court known the numerical split, that Juror Lizana was the sole holdout, or anything else. The *Haskett* court merely examined the totality of the circumstances to determine whether the inquiry was coercive. It did not purport to provide a model for inquiries, nor could it have. Every inquiry into juror misconduct will arise in a unique circumstance. Any rules for inquiry must remain adaptable to each particular case.

Contrary to what Donis infers, the trial court never suggested that Juror No. 5 had not honored his oath or that he had prejudged the case. The trial court merely asked neutral questions designed to elicit whether Juror No. 5 was deliberating, and it reminded Juror No. 5 of his oath. We perceive no impropriety. Nor can it be said that the trial court was insufficiently sensitive to the possibility that Juror No. 5 may have had a good faith reason to vote against the majority. The trial court never suggested that Donis should vote with the majority. Rather, the trial court reminded Donis that he had an obligation to deliberate and keep a fair mind. We reject the suggestion that the trial court was required to specifically tell Donis that he had a right to disagree with the majority. Such a statement would have unfairly suggested that the trial court supported the holdout view. Moving to the next point, we reject Donis's claim that the trial court sent the message that it was siding with the majority. Nothing in the trial court's comments can be construed as anything but neutral. Juror No. 5 never complained that the other jurors were guilty of misconduct and should also be investigated, so he could not have inferred that the trial court was trying to ensure a guilty verdict by placing undue pressure on the only juror contemplating acquittal. Finally, the trial court never mentioned CALCRIM No. 224, nor did it discuss how Juror No. 5 should view circumstantial evidence, so we reject Donis's argument that the trial court improperly interfered with Juror No. 5's interpretation of that instruction.

## F. The *Allen* charge.

Donis argues that reversal is required because of the trial court's final instructions, or *Allen* charge. Donis claims that the instructions violated the prohibition in *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), disapproved on other grounds in *People v. Valdez* (2012) 55 Cal.4th 82, 163 (*Valdez*), against an *Allen* charge that "encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them." (*Gainer*, *supra,* 19 Cal.3d at p. 852.)[6] We cannot concur.

The trial court told the jurors to keep an open mind, listen to each other and treat each other with respect. We conclude that the trial court did not violate *Gainer* because it did not tell the jurors that they should reconsider their views based on the numerical division or a majority of votes.

Donis assigns error to the final instruction on the additional theory that the trial court implied that Juror No. 5 must base his decision on the opinion of the majority of jurors and that the jury had to reach a verdict. The implication, Donis tells us, arises because the trial court said the jurors were a team, they had to keep open minds and listen to each other, and they would have to get through the deliberations one way or another. This claim lacks merit. The trial court never intimated that the minority jurors should give in to the majority jurors. When the trial court called the jury a team, there was no reason for Juror No. 5 to believe that he was being told to vote with the majority. The statement was made in the context of telling all the jurors to respect each other and keep

---

[6]    The term "'*Allen* charge' encompasse[s] 'a variety of permutations and amplifications' of wording in a controversial instruction that was given to a deadlocked jury in [*Allen*]. [Citation.] The *Gainer* court identified two aspects of *Allen* instructions that introduced 'extraneous and improper considerations into the jury's debates,' and held that 'it is error for a trial court'" to utilize those aspects. (*People v. Butler* (2009) 46 Cal.4th 847, 883.) For example, a jury should not consider the expense and inconvenience of a retrial when deliberating, nor should it be told that the case must be decided at some point. (6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2000) Judgment § 44, pp. 73-76.) In federal court, an *Allen* charge has been identified as any supplemental instruction given to a deadlocked jury. (*U.S. v. Nickell* (9th Cir. 1989) 883 F.2d 824, 828.)

22

an open mind. Moreover, the trial court stated "that there is a reasonably good chance you [can] arrive at a decision one way or the other." Thus, the trial court couched the final instruction in terms of what it thought was possible—that the jury would possibly convict but it might acquit—and never suggested unanimity or a particular result was required or expected.

Citing *Jimenez v. Myers* (9th Cir. 1994) 40 F.3d 976, 981 (*Jiminez*), Donis argues that the final instruction amounted to what was found to be an impermissible *Allen* charge under federal law.

*Jiminez* involved a deadlocked jury. After the first impasse, the trial court determined that the progression of the vote, expressed approval of that progression, and told the jury to continue deliberating. Thus, the trial court "effectively instructed the jurors to make every effort to reach a unanimous verdict." (*Jimenez, supra,* 40 F.3d at p. 980.) After a second impasse, the trial court learned that only one juror remained in the minority. Given "the trial court's implicit approval of the 'movement' toward unanimity, the [trial] court's instruction to continue deliberating until the end of the day sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." (*Id*. at p. 981.) The court concluded: "We conclude from all the circumstances that the defendant was denied a fair trial. In reaching this conclusion, we do not question the practice of California judges to ask the jury its numerical division after an impasse. We conclude, however, that under established due process standards, the comments and conduct of the trial court in this case crossed the line between neutral inquiry and coercive instruction." (*Ibid*.) *Jiminez* holds no sway here. The trial court never expressed approval for the progression of the vote, so he did not impliedly instruct the jury to reach a unanimous verdict. Nor did the trial court tell the jury to deliberate until a set time. We easily conclude that the context of the *Allen* charge in *Jiminez* is distinguishable.

Even if we found that the trial court had implied that the jury should reach a unanimous verdict by calling it a team and saying that one way or another, it would have

to get through the process, we would affirm. "[A]s to an erroneous instruction that 'does not threaten to distort the process of jury decision-making to the same degree[]' [as the instruction prohibited by *Gainer*,] reversal is appropriate only if the reviewing court, considering 'all the circumstances under which the charge was given,' finds it 'reasonably probable' the defendant would have obtained a more favorable result absent the error. [Citation.]" (*Valdez*, *supra*, 55 Cal.4th at p. 164.) Here, the jury was previously instructed to reach a verdict "if you can." "Telling a jury it should reach a verdict if it can, before deliberations begin, is not coercive." (*People v. Santiago* (2009) 178 Cal.App.4th 1471, 1476.) The trial court also instructed: "Do not hesitate to change your mind if you become convinced that you're wrong, but do not change your mind just because the other jurors disagree with you." It also stated: "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." After additional argument, the trial court stated: "[R]emember you're not an advocate for one side or the other. Both sides are entitled to a fair trial which means 12 fair-minded, open-minded impartial jurors." This statement, as well as the overall tenor of the trial court's instructions, indicated that the jurors were supposed to deliberate in good faith and not reach a particular result. Moreover, there was strong evidence of guilt and insufficient evidence of self-defense. Beyond that, it appears that the jurors deliberated in good faith because the jury continued deliberating for almost two hours after the final instruction and six jurors ended up changing their vote on second degree murder with respect to count 1. Also, the jurors found the premeditation allegation to be not true in connection with count 2. Finally, counsel for Donis did not object to the final instruction. "[W]here, as here, defense counsel does not object to a supplemental instruction, 'such an omission indicates that the potential for coercion argued now was not apparent to one on the spot.' [Citation.]" (*People v. Whaley* (2007) 152 Cal.App.4th 968, 983.) Given the context, and given defense counsel's failure to object, we conclude that any error by the trial court was harmless under *Watson*.

24

In his reply brief, Donis relies heavily on *United States v. Evanston* (9th Cir. 2011) 651 F.3d 1080 (*Evanston*). He claims that *Evanston* and his case are markedly similar. It "examine[d] whether a district court may, over defense objection and after the administration of an unsuccessful *Allen* charge, inquire into the reasons for a trial jury's deadlock and then permit supplemental argument focused on those issues, where the issues in dispute are factual rather than legal." (*Evanston*, *supra*, at p. 1082, fn. omitted.) Ultimately, the court "conclude[d] that allowing such a procedure in a criminal trial is an abuse of the discretion accorded district courts in the management of jury deliberations." (*Ibid*.) In a footnote, the *Evanston* court clarified that "we do not reach today the question of whether the use of supplemental arguments to address factual matters is necessarily or always an error of constitutional dimension, whatever the circumstances. Rather, we hold that, under the circumstances presented here, the district court's actions resulted in impermissible coercion, and consequently an abuse of discretion meriting reversal. We so limit our holding because the Supreme Court's precedent on similar jury coercion issues has generally emanated from its supervisory powers over the federal courts, rather than any mandate from the federal Constitution." (*Id*. at p. 1093, fn. 15.) Because *Evanston* does not involve constitutional rules or principles that impact state courts, we decline to apply it here.

## II. Section 654 Precludes Separate Punishments for Counts 2 and 3.

Donis argues that he cannot be punished for both attempted murder and aggravated mayhem in counts 2 and 3 because they involved an indivisible course of conduct and intent. We agree.

Section 654 "'prohibits punishment for two crimes arising from a single indivisible course of conduct. [Citation.] If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.] The defendant's intent and objective are

25

factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence. [Citation.]' [Citations.]" (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1015 (*Bui*).)

"[M]ultiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm. [Citations.] 'Separate sentencing is permitted for offenses that are divisible in time. . . .' [Citation.]" (*People v. Felix* (2001) 92 Cal.App.4th 905, 915; *People v. Gaio* (2000) 81 Cal.App.4th 919, 935 ["This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken"].)

At the sentencing hearing, defense counsel said, ". . . I think that the counts 2 and 3 merge." The trial court replied: "I agree." The prosecutor assumed that the trial court would find a merger. But then the trial court stated: "I don't know. When I [previously] said I agree with [defense counsel] that they merge, I [meant] in the sense that the sentences for counts 2 and 3 should run concurrently with each other. It may be that they could be sentenced consecutively. But since it was the same act occurring at the same time, out of fairness to [Donis], I think that he should be sentenced concurrently to count 2 and 3."

Thus, the trial court did not make findings that would avoid section 654. It did not find that the Donis had several independent criminal objectives, nor did it find that he had a chance to reflect between the offenses and each offense created a new risk of harm. By finding that the acts occurred at the same time, the trial court rejected the idea that the offenses were divisible in time. Given the record and the trial court's findings, *Bui* prohibits separate punishments.

In *Bui*, the defendant fired three shots and hit the victim twice. The defendant was found guilty of attempted murder and mayhem. He received consecutive sentences for those offenses. Based on section 654, the court reversed. It noted that at the sentencing hearing, "the trial court indicated that the two crimes were 'the same occasion and same

set of operative facts.'" (*Bui*, *supra*, 192 Cal.App.4th at p. 1015.) Both crimes were based on the shooting of the victim. All three shots were fired within seconds of each other and formed one transaction. "There was no evidence defendant had independent objectives for the two crimes that would justify multiple punishments. In the circumstances, the sentence for the [lesser included count of] mayhem . . . should have been stayed. [Citation.]" (*Ibid*.)

Here, Donis used a single weapon against Ramos: the machete. Every time Donis hit Ramos with the machete, it was attempted murder and aggravated mayhem. Indeed, the trial court expressly found that the two offenses were the same act. Thus, the two offenses were indivisible. Consequently, we conclude that one offense was the means of accomplishing the other offense.

The People argue that the aggravated mayhem was not incidental to the attempted murder. They cite *People v. Cleveland* (2001) 87 Cal.App.4th 263 and *People v. Nguyen* (1988) 204 Cal.App.3d 181, 192 (*Nguyen*). These cases are distinguishable. They held that attempted murders occurring during robberies did not merge under section 654 because they were not necessary to commit the robberies and amounted to gratuitous violence that could not be called incidental. (*People v. Cleveland*, *supra*, at pp. 271–272; *Nguyen*, *supra*, 204 Cal.App.3d at pp. 190–191.) In *Nguyen*, the defendant argued that the victim was shot in order to eliminate him as a witness to the robbery or to facilitate the defendant's escape. The court stated: "Perhaps; but at some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and a more sinister goal than mere successful commission of the original crime." (*Ibid*.) Here, the aggravated mayhem was necessary for Donis to accomplish the other offense. Moreover, attempted murder by machete and aggravated mayhem by machete are equally extreme.

The People suggest that the severity and number of cuts went far beyond what was reasonably necessary to achieve only one objective. We fail to appreciate the point. Ramos did not die, so none of the hits were sufficient to accomplish the attempted goal, which was murder. Every hit, therefore, was a further act in connection with Donis's

27

attempted murder of Ramos.  As for aggravated mayhem, every hit increased the amount of mayhem, so it cannot be said that the later hits were unnecessary to complete the full range of mayhem inflicted.

We conclude that the trial court erred when it declined to stay the sentence on count 2 pursuant to section 654.  The sentence on count 2 is hereby stayed.  The stay extends to the related deadly or dangerous weapon enhancement and great bodily injury enhancement that increased the sentence an extra four years.  (*People v. Guilford* (1984) 151 Cal.App.3d 406, 410–411.)

### III.  The Great Bodily Injury Enhancement for Count 3.

A great bodily injury enhancement pursuant to section 12022.7, subdivision (a) may not be imposed to enhance a sentence for mayhem.  (*People v. Pitts* (1990) 223 Cal.App.3d 1547, 1559.)  Based on the People's request, we strike the great bodily injury enhancement imposed on count 3.

### IV.  Assessments under Government Code section 70373.

The law provides:  "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense. . . .  The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony."  (Gov. Code, § 70373, subd. (a)(1).)  The trial court imposed one $30 assessment against Donis.  A $30 assessment should have been imposed for every conviction for a total of $90.

**DISPOSITION**

We order the sentence on count 2 stayed pursuant to section 654 and the great bodily enhancement on count 3 stricken. In addition, we order Donis to pay a $90 assessment pursuant to Government Code section 70373, which is $30 for each of his three felony convictions. As modified, the judgment is affirmed. On remand, the trial court is directed to modify the abstract of judgment to reflect that the sentence on count 2 is stayed, the great bodily injury enhancement on count 3 is stricken, and Donis shall pay a $90 assessment pursuant to Government Code section 70373, subdivision (a)(1). The trial court shall forward a copy of the revised abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
              ASHMANN-GERST


We concur:


_____, P. J.
       BOREN


_____, J.
       CHAVEZ

29