Filed 5/24/16  P. v. Hunter CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAMIAN JAMAL HUNTER,<br><br>    Defendant and Appellant. | B263599<br><br>(Los Angeles County<br>Super. Ct. No. MA057774) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles A. Chung, Judge.  Affirmed as modified.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and David A. Wildman, Deputy Attorneys General for Plaintiff and Respondent.

_____

Defendant Damian Jamal Hunter appeals from the judgment entered after his jury conviction of second-degree robbery (Pen. Code, § 211).[1] He seeks reversal on the grounds that the evidence does not support the verdict and that the trial court should have declared a mistrial because the jury was deadlocked. We find that there is substantial evidence to support the conviction and that the trial court did not abuse its discretion in determining that there was a reasonable probability the jury would reach a unanimous decision. On the People's concession, we strike one of two five-year terms imposed under section 667. The judgment is affirmed as modified.

## FACTUAL AND PROCEDURAL SUMMARY

On October 24, 2012, at approximately 8:00 p.m., the victim, a delivery driver for Rigatoni's Pizza,[2] made a delivery to an apartment complex. The items delivered were pizza, chicken wings, and two liters of coke. When he arrived, he saw a woman waiting for him outside and a man standing behind a truck in the driveway. The driver removed the food from his vehicle and handed the receipt to the woman. As he waited for her to pay, the man walked up to him, placed what the victim thought was a gun in his stomach, pushed him against his delivery vehicle, and said, "[G]ive me all your money, mother fucker." The victim gave the man all the money he had in his pockets. The man took the money and food and walked away.

The victim returned to his vehicle and drove away. He found a sheriff's vehicle several blocks away, stopped, and reported the robbery. Deputy Andrade responded to the apartment complex. In an apartment rented by Robin Castro, he found chicken wings on the table, pizza in a plastic bag in the oven, and a red hooded sweatshirt in a hall closet.

Later that evening, a sheriff's deputy brought the victim back to the apartment

---

[1]     All further statutory references are to the Penal Code.

[2]     Defendant's opening brief notes that the proper spelling of the restaurant is Rigatony's Pizza. We use the spelling as provided in the reporter's transcript.

complex for a field lineup. The victim sat in the back of a sheriff's vehicle, while officers shined a spotlight on each of four individuals[3] who had been found in Castro's apartment. Defendant was one of the four. The victim was unable to identify anyone in the lineup as the robber. Detective Donnel testified at trial that after the field lineup, the victim told him that defendant "appeared to be too tall because he believed the person that robbed him was about the same height as him or slightly shorter than him."

At trial, the victim described the robber as a Black man, who wore a red zip-up hooded sweatshirt. The victim was shown an exhibit of the red hooded sweatshirt found in Castro's apartment and identified it as the sweatshirt the robber had been wearing. When asked by the prosecutor if anyone in the courtroom matched the description of the robber, the victim identified defendant, stating, "He looks like the guy. I mean, I can't say for sure. It was over a year ago but it looks like him." When asked how sure he was, the victim testified that he was approximately 80 percent sure. On cross-examination, the victim acknowledged that it was fair to say his memory of events directly after the robbery was better than it was on the day of trial, which was 14 months later.

The prosecution called Castro as a witness. The parties stipulated that the order called into Rigatoni's Pizza for pizza and chicken wings had been placed on Castro's phone. She testified that she did not know defendant. The prosecution then introduced her prior testimony from the preliminary hearing. She had identified defendant, testifying that he had been at her apartment the night of the robbery and had left her apartment around eight in the evening, wearing the red hooded sweatshirt that was later found in her closet. She also testified that defendant borrowed her phone before leaving the apartment and returned approximately 45 minutes later with chicken wings and pizza in a grocery bag. When he returned, he was no longer wearing the red hooded sweatshirt.

The prosecution also called Danyelle Bates as a witness. Bates was convicted for

---

[3]     There is a discrepancy in the record: the victim testifies that he was shown 10 to 14 people in the field lineup, whereas the sheriff's deputy conducting the lineup testified that four individuals were shown to the victim.

her involvement in the robbery and at the time of trial was serving her sentence. In response to the prosecution's question whether she recalled seeing defendant at Castro's apartment the night of the robbery, she testified that she did not. The prosecution then introduced her prior statements made in an interview with Detective Donnel. During a recorded interview, she told the detective that she had been with defendant at Castro's apartment on the night of the robbery. She also said that she was the one who called in the order for pizza and chicken wings and that she and defendant brought the food back to Castro's apartment. After the recording of the interview was played for the jury, Bates testified that she had lied in her interview out of spite because the detective had told her that defendant had blamed her for the robbery. She then testified that she had committed the robbery by herself.

The jury began deliberations on February 2, 2015 at 2:10 p.m. On the first day of deliberations, the jury requested the transcript or recording of Castro's testimony at the preliminary hearing and any fingerprints or other forensic evidence. The court responded that the jury could only consider evidence presented during trial. On February 3, the jury asked how defendant had been identified by the victim and how long after the crime he had been identified, and requested the transcript of Castro's examination by the prosecution. The jury was provided a readback of Castro's testimony.

On February 4, the jury sent a note requesting a readback of Bates' testimony. The court informed the jury that the readback would not be available until after lunch. Before the readback was provided, the jury sent the court a note, stating, "Currently with the evidence provided the jury cannot reach a unanimous decision," and noting the division nine (guilty) to three (not guilty).

The court asked the foreperson whether it was his opinion that the jury was deadlocked. The foreperson responded that is was. The court then asked about the number of votes the jury had taken and the numerical breakdown of the votes, specifically requesting that the foreperson not reveal the nature of the divisions. The foreperson indicated the breakdown of votes was 6-6, 6-6, 7-5, 9-3, 8-4, 10-2, and 9-3.

4

The court asked the foreperson if there was anything that could be done to help the jury deliberate further, and the foreperson responded that there was. The court then asked each of the other 11 jurors if they believed the jury was hopelessly deadlocked or if further deliberations could be helpful. Ten jurors responded that they were deadlocked and one juror responded that further deliberations could be helpful. The court also asked the jurors if there was anything that would help them further deliberate. The record does not indicate that any requests were made at the time.

The court instructed the jury as follows: "Folks, what I'm going to do is I'm going to send you back to continue your deliberations. You have been deliberating for a decent amount of time but I think because of the movement in the votes and whatnot and because some jurors believe that there might still be hope for a unanimous decision, one way or the other, I will send you back to continue to deliberate." Later that afternoon, the jury sent another note, expressing concern with one of the juror's ability to pay attention and stay awake. After inquiring further and discussing the issue with counsel, the court decided not to remove the juror.

On the morning of February 5, the jury sent a note, explaining, "One juror appears to be difficult to come to a common conclusion. The opinion of this juror could be influencing the other 2 non-agreeing jurors." After discussing the note with counsel, the court decided not to take action. At 3:30 that afternoon, the jury sent a final note asking whether the portion of the verdict form that stated, "'personally used a firearm, a SHOTGUN'" only pertained to an actual shotgun or "anything implied to be a firearm." The court responded that the allegation referred to an actual shotgun. Less than an hour later, the jury reached a verdict, finding defendant guilty of second degree robbery and finding "not true" the special allegation that the offense was committed with a firearm. Defendant was sentenced to 25 years to life under the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12). The court added two five-year terms under section 667, subdivision (a), and three one-year terms under section 667.5, subdivision (b). The aggregate sentence was 38 years to life.

5

## DISCUSSION

### I

Defendant argues the record contains insufficient evidence to convict him of second degree robbery. The test on appeal for sufficiency of the evidence is "'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The test is not whether the evidence establishes guilt beyond a reasonable doubt but whether the evidence could persuade a reasonable jury to find guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

We conclude that substantial evidence supports the verdict. The parties stipulated that the cell phone used to place the order at Rigatoni's Pizza belonged to Castro and sheriff's deputies found pizza and chicken wings in her apartment. The victim testified that he made the delivery to Castro's apartment complex at about eight in the evening, the robber was wearing a red hooded sweatshirt, and after robbing him, the robber walked away with his money, the pizza, and the chicken wings.

Although Castro testified at trial that she did not recall details from the night of the robbery, the prosecutor introduced her prior statements from the preliminary hearing. On that occasion, she testified that defendant borrowed her phone on the evening of the robbery and that he was wearing a red hooded sweatshirt when he left her apartment around 8:00 p.m. Castro also testified that defendant returned after approximately 45 minutes, with chicken wings and pizza in a grocery bag, and that when he returned he was no longer wearing the red hooded sweatshirt. Defendant did not return her phone, and the phone was not recovered.

Bates testified at trial that she committed the crime by herself, but the prosecution introduced her prior statements from the recorded interview with Detective Donnel. In

6

that interview, she told the detective she had been with defendant at Castro's apartment the night of the robbery, she called Rigatoni's Pizza and ordered the pizza and chicken wings, and she and defendant brought the pizza and chicken wings back to Castro's apartment.

Although Castro recanted her testimony from the preliminary hearing and Bates recanted statements she made in her interview with Detective Donnel, the prosecution introduced their prior statements. The jury had the opportunity to - and did - weigh each witness' credibility, as reflected by the jury's notes to the court asking for a readback of both witnesses' testimony. Conflicts in witness testimony do not justify the reversal of a judgment because it is the exclusive province of the jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Additionally, "[t]he use of an alias is circumstantial evidence of consciousness of guilt." (*People v. Manson* (1976) 61 Cal.App.3d 102, 149.) Detective Pico testified that when questioned on the night of the robbery, defendant gave a false name and birth date.

The victim was unable to identify defendant during the field identification that occurred shortly after the robbery, and it was only at trial, after being asked if he saw "anybody in [the courtroom] that would match the description of [the robber]," that the victim identified defendant. The victim explained to the jury, "He looks like the guy. I mean, I can't say for sure. It was over a year ago but it looks like him." When asked how sure he was, the victim responded approximately 80 percent.

This in-court identification, combined with Castro's and Bates' statements and the fact that defendant gave false identification information to Deputy Pico, supports the inference of guilt. (See *People v. Ochoa, supra,* 6 Cal.4th at p. 1206 [we give prevailing party benefit of every reasonable inference and resolve all conflicts in its favor]; see also *People v. Ford* (1983) 145 Cal.App.3d 985, 988 [to reverse conviction for insufficiency of evidence it must "'"clearly appear that upon no hypothesis whatever is there substantial evidence to support it"'"].)

7

## II

"Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) "The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citations.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' [Citation.]" (*People v. Miller* (1990) 50 Cal.3d 954, 994.)

There always is a potential for coercion once the trial judge has learned the majority of jurors favor conviction. (*People v. Sheldon* (1989) 48 Cal.3d 935, 959.) However, the inadvertent discovery of the nature of the division is not a basis for a mistrial; nor is simply asking the jury to continue deliberating inherently coercive. Whether a unanimous vote was coerced requires a close analysis of the court's conduct from the perspective of the holdout jurors. (See *id.* at pp. 959-960.) Nothing in this record may be construed as an attempt to pressure the jury to reach a verdict. "The trial court made no coercive remarks and exerted no undue pressure on the minority juror[s] to change [their] vote. [Citation.]" (*Id.* at p. 959.) Rather, the court made a discretionary determination that there was a reasonable probability the jury would reach a unanimous decision.

As we have discussed, after two days of deliberation, the jury sent the court a note indicating that they were deadlocked, nine to three, with nine in favor of guilt and three in favor of a not guilty verdict. After inadvertently learning that the majority of jurors favored conviction, the court polled the jury to determine whether any of them thought there was a possibility of reaching a unanimous decision. Ten of the jurors believed that the jury was deadlocked and two believed that there was hope for a unanimous decision. The court then asked if the jury had taken prior votes and the foreperson responded in the

8

affirmative. The court asked for the division of those votes, but explicitly requested that the foreperson not reveal the nature of the divisions. In spite of the majority's assessment that they were deadlocked, the record indicated that after the first two votes, each successive ballot revealed a change in the votes. The court's determination that it was reasonably probable that the jury could reach a verdict is supported by the record.

The court's subsequent instruction to the jury was not coercive. The court instructed the jurors that it was asking them to continue deliberations because of the movement in the votes and because two jurors believed there was hope for a unanimous decision. The court was careful to clarify that there were jurors who believed there was hope for a unanimous decision "one way or the other," indicating the court was not urging or suggesting the jury reach a guilty verdict. (See *People v. Walker* (1949) 93 Cal.App.2d 818, 825 [when trial court has learned how jurors voted, it has "duty to be more than careful" in its remarks so jury will "clearly understand" it is "not urging, or even suggesting a verdict one way or the other"].) Finally, this was the first time the jury had notified the judge that it was deadlocked, and the court made no comments suggesting possible reprisals if the jury failed to reach an agreement. (See *People v. Harris* (2005) 37 Cal.4th 310, 365; *People v. Sheldon*, *supra*, 48 Cal.3d at p. 960.)

We find no abuse of discretion.

III

Defendant challenges the sentence enhancement under section 667. The trial court imposed two five-year terms, one for each of defendant's prior serious felony convictions. Defendant's prior convictions arose from one case, which contravenes the requirement of section 667 that the prior "strikes" must have been "brought and tried separately." (§ 667, subd. (a)(1).) Respondent concedes error on this point. Because the prior convictions stem from one case, it was error to impose separate five-year terms for each of the convictions. We order one of the five-year terms stricken.

## DISPOSITION

The judgment is affirmed as modified. The superior court is directed to prepare a corrected abstract of judgment, deleting one of the five-year terms imposed under section 667, and forward it to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.

10